Shannon JOHNSON, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Nos. 464, 2008, 489, 2008.

Supreme Court of Delaware.

Submitted: Aug. 12, 2009.
Decided: Nov. 4, 2009.

James J. Haley, Jr., Esquire, Ferrara & Haley, Wilmington, DE, for appellant.

Paul R. Wallace, Esquire (argued), Danielle J. Brennan, Esquire, James T. Wakley, Esquire and Karin M. Volker, Esquire, Deputy Attorneys General, Department of Justice, Wilmington, DE, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

HOLLAND, Justice:

This is the direct appeal by the defendant-appellant, Shannon Johnson, who has been sentenced to death. An indictment was filed in the Superior Court charging Johnson with Murder in the First Degree (Cameron Hamelin), Attempted Murder in the First Degree (Lakeisha Truitt), Possession of a Firearm During the Commission of a Felony (two counts), and Possession of a Deadly Weapon by a Person Prohibited, regarding a September 24, 2006, incident. The indictment also charged Johnson with Attempted Murder in the First Degree (Lakeisha Truitt), Possession of a Firearm During the Commission of a Felony and Possession of a Deadly Weapon by a Person Prohibited, regarding a November 10, 2006, incident. On March 27, 2008, the jury returned a verdict of guilty on all counts, reducing the Attempted Murder in the First Degree (9/24/06) to the lesser-included offense of Reckless Endangering in the First Degree and the second Attempted Murder in the First Degree (11/10/06) to the lesser-included offense of Assault in the First Degree.

After a four-day penalty hearing held in early April 2008, the jury unanimously recommended that Johnson be sentenced to death. On September 5, 2008, the Superior Court trial judge sentenced Johnson to death. Johnson has appealed his convictions to this Court and the automatic appeal of his death sentence was also docketed. The cases have been consolidated.

Johnson has raised several issues in this direct appeal challenging the judgments of conviction and his sentence of death. First, he argues that, in the guilt phase, the Superior Court erred when it denied Johnson's motion to suppress letters, written by Johnson to Rima Stewart ("Stewart"), which had been seized and copied by the State. Second, Johnson contends that, in the guilt phase, the Superior Court erred when it failed to sever the two "Possession of a Deadly Weapon by a Person Prohibited" charges from the other charges at Johnson's jury trial. Third, according to Johnson, in the guilt phase, the Superior Court erred when it admitted evidence suggesting that Johnson had been involved in a prior shooting of his stepfather. Fourth, Johnsons submits that, in the guilt phase, the Superior Court erred when it "stifled" the cross-examination of Lakeisha Truitt ("Truitt"), the State's lead witness, by ruling that Johnson's inquiry into Truitt's prior romantic relationships would open the door for rebuttal evidence of Johnson's prior abuse of Truitt.

Johnson also has raised several issues related to the penalty phase of this bifur-

cated capital proceeding. First, he contends that, in the penalty phase, the Superior Court erred when it allowed the State to submit hearsay evidence regarding Johnson's prior Rape in the Fourth Degree conviction. Second, he argues that, in the penalty phase, the Superior Court erred when it prohibited Johnson from submitting hearsay evidence from his brother, Damien Johnson, regarding Johnson's state of mind at the time he accepted the Rape in the Fourth Degree plea in August 2003. Third, Johnson submits that, in the penalty phase, the Superior Court erred when it admitted evidence suggesting that Johnson had some involvement in a prior shooting of his stepfather without first weighing the reliability of the evidence and its probative value versus its unfairly prejudicial effect. Fourth, he contends that, in the penalty phase, the Superior Court erred when it admitted narrative testimony from Cameron Hamelin's father regarding a proposed "Cameron's Law" pending in the Delaware General Assembly ("House Bill 163"). Finally, Johnson argues that our statutory review of Johnson's death sentence mandated by section 4209(g)(2) "should raise concern" about the imposition of the death sentence.

We have concluded that no reversible error occurred during either the guilt phase or the penalty phase of Johnson's trial. Therefore, the judgments of conviction are affirmed. We have also carefully reviewed, in accordance with our statutory mandate, the sentence of death, and have concluded that the death sentence was properly imposed and must be affirmed.

### Facts

On the morning of September 24, 2006, Cameron Hamelin ("Hamelin") was shot intentionally and killed while seated in his vehicle at the intersection of Jessup and Vandever Streets in Wilmington. Truitt, who was in the passenger seat of Hamelin's vehicle, was not struck.

Truitt called 911 and identified Shannon Johnson, the father of her child, as the shooter. Johnson was not apprehended immediately.

Weeks later, on November 10, 2006, Truitt was driving her vehicle in Wilmington, near her home on 35th Street, when she was shot intentionally. Truitt survived and identified Johnson as the person who shot her. On November 15, 2006, Johnson was arrested in Wilmington at the home of a female friend, Stewart.

### Johnson's Letters from Prison

■ Johnson's first argument is that during the guilt phase of his trial, the Superior Court erred when it denied his motion to suppress letters, written by Johnson to Stewart, while he was incarcerated awaiting trial. Stewart was Johnson's girlfriend at the time he was arrested. As a result of her conduct during the investigation of Hamelin's murder, Stewart was charged with, and convicted of, hindering Johnson's prosecution.

At some point during the criminal proceedings against Stewart, she disclosed to Detective Ciritella, the chief investigating officer of the Hamelin murder, that Johnson was in contact with Truitt, Johnson's victim and the State's key witness at trial. According to Stewart, Truitt visited Johnson while he was incarcerated and also spoke with him over the telephone.

Detective Ciritella confirmed that Johnson had been in contact with Truitt. In early December 2007, Detective Ciritella was unable to contact Truitt to discuss this matter. The Attorney General therefore issued a subpoena on December 6, 2007, directing the prison officials to give the State copies of all of Johnson's incoming and outgoing mail, beginning on the first

date of his incarceration in this case, November 15, 2006.

In early January 2008, Detective Ciritella heard from two informants who had recently been incarcerated in the same prison unit as Johnson. According to the informants, Johnson had been soliciting people to kill Truitt. Both informants stated that Johnson had instructed them to visit Stewart once they were released from prison, and that she would provide assistance in killing Truitt.

At trial, the State wanted to submit into evidence letters written by Johnson to Stewart that ended with the phrase "death before dishonor." According to the State, this phrase explains Johnson's motive for the attacks on Truitt and Hamelin. These letters were obtained pursuant to the Attorney General's subpoena: the Department of Corrections intercepted, opened and copied Johnson's mail, forwarding the copies to the Attorney General's office and sending the originals to the intended recipients. The Attorney General's subpoena did not, however, authorize the censorship or confiscation of his mail. Johnson has not alleged that any original mail was not eventually delivered to its intended recipient. Although the subpoena permitted the photocopying of all incoming and outgoing mail, Johnson has only challenged the State's use of five outgoing letters that Johnson sent to Stewart.

The trial transcript indicates that one letter was dated December 13, 2007, and another was dated December 17, 2007, but the date of the other letters is not provided. Before trial, Johnson moved to suppress the letters he had written to Stewart from prison. After a suppression hearing at which Detective Ciritella testified, the trial judge denied Johnson's motion, ruling that the seizure was justified by the State's legitimate interest in ensuring that Truitt would be "able and available to cooperate" as a witness at trial. The State therefore offered these letters into evidence.

During the time period in which the State inspected Johnson's mail pursuant to an Attorney General's subpoena [1] served upon prison officials, Johnson was a pretrial detainee. Johnson's argument on appeal is that he "had every reason to expect that his communications with Stewart were private." According to Johnson, the State has violated his First and Fourth Amendment rights.

### First Amendment Claim

In *Stroud v. United States*,[2] the United States Supreme Court first established that prison officials may in some situations seize non-privileged mail sent from prison by an inmate without violating that inmate's Fourth or Fifth Amendment rights. At trial, the defendant Stroud had unsuccessfully challenged the district attorney's submission into evidence of letters that he had written while incarcerated and awaiting trial, and which tended to establish his guilt.[3] The Court agreed with the trial court's decision to admit the letters, noting first that the letters were voluntarily written, and second that "[t]hey came into the possession of the officials of the penitentiary under established practice, reasonably designed to promote the discipline of the institution." [4]

The United States Supreme Court has not revisited the issue of whether, in gen-

1. *See* Del.Code Ann. tit. 29, §§ 2504(4), 2508(a) (2003).

2. *Stroud v. United States*, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919).

3. *Id.* at 21, 40 S.Ct. 50.

4. *Id.*

eral, an inmate's outgoing letters which contain inculpatory information may be submitted into evidence against him at trial. Thus, *Stroud* still stands as the seminal case for this principle.[5] Nor has the Court again addressed inmate mail regulations after *Stroud* in the context of the Fourth Amendment; instead, the cases have addressed First Amendment claims. These subsequent holdings, which more generally address prison officials' right in the first place to inspect, censor, or seize inmate mail, are not uniform.

In *Procunier v. Martinez*,[6] the United States Supreme Court effectively applied a strict scrutiny test to all restrictions on prisoner mail—incoming and outgoing. Analyzing a California Department of Corrections regulation censoring inmate mail that it deemed likely to contain inflammatory statements, the Court applied a two-part test:

> First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials … must show that a regulation authorizing censorship furthers one or more of the substantial government interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no great-

er than is necessary or essential to the protection of the particular governmental interest involved.[7]

The *Martinez* decision stood alone in the Court's analysis of regulations regarding inmate mail until *Turner v. Safley*,[8] in 1987. In that case, the United States Supreme Court considered a Missouri prison regulation that forbade communication among inmates at separate institutions. Upholding the regulation, the Court retreated from *Martinez*, holding: "when a prison regulation impinges on inmates' Constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."[9] Since then, the United States Supreme Court has consistently applied the *Turner* standard to cases involving prisoners' Constitutional rights in many contexts.[10]

Nevertheless, the Court has not totally overruled the higher scrutiny standard of *Martinez*. In *Thornburgh v. Abbott*,[11] the Court narrowly construed *Turner's* impact on *Martinez*. *Thornburgh* involved a First Amendment challenge to a District of Columbia prison regulation regarding the receipt of subscription publications. The Court applied *Turner* and upheld the regulation, effectively limiting *Martinez* rather than overruling it:

---

5. *See Busby v. Dretke*, 359 F.3d 708, 722 (5th Cir.2004).

6. *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *see also Nasir v. Morgan*, 350 F.3d 366, 370 n. 4 (3d Cir.2003) ("Although the *Martinez* Court never used the words "strict scrutiny," subsequent Supreme Court cases refer to *Martinez* as applying strict scrutiny." *See Turner v. Safley*, 482 U.S. 78, 83, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Nevertheless, Justice Blackmun, in *Thornburgh v. Abbott*, declined to recognize *Martinez* as calling for a least-restrictive means test, the hallmark of strict scrutiny analysis. *Thornburgh v. Abbott*, 490 U.S. 401, 411, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)).

7. *Procunier v. Martinez*, 416 U.S. at 413, 94 S.Ct. 1800.

8. *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

9. *Id.* at 89, 107 S.Ct. 2254.

10. *See Nasir v. Morgan*, 350 F.3d at 370–71 (collecting United States Supreme Court case law applying *Turner* with regard to prisoner Constitutional rights).

11. *Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).

[A] careful reading of *Martinez* suggests that our rejection of the regulation at issue resulted not from a least restrictive means requirement, but from our recognition that the regulated activity centrally at issue in that case—outgoing personal correspondence from prisoners—did not, by its very nature, pose a serious threat to prison order and security. . . .

. . . .

Furthermore, we acknowledge today that the logic of our analyses in *Martinez* and *Turner* requires that *Martinez* be limited to regulations concerning outgoing correspondence. . . . The implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials.[12]

The Court in *Thornburgh* recognized, however, that there may still be considerable danger in outgoing mail: "the implications for security are far more predictable. Dangerous outgoing correspondence is more likely to fall within readily identifiable categories: examples . . . include escape plans, plans relating to ongoing criminal activity, and threats of blackmail or extortion."[13]

No Delaware case has directly addressed this distinction in the United States Supreme Court cases. The Third Circuit has construed *Thornburgh's* discussion with regard to outgoing mail merely as dictum, since "*Thornburgh* was a case about incoming mail."[14] Nonetheless, that court has stated that "[b]ecause *Thornburgh* holds that *Turner* does not squarely overrule *Martinez* as applied to outgoing mail, we will apply *Turner* to incoming mail and *Martinez* to outgoing correspondence."[15]

In *Nasir v. Morgan*,[16] the Third Circuit analyzed a prison regulation which prohibited correspondence between current and former inmates. The inmate, Nasir, challenged the regulation with respect to both incoming and outgoing mail. The court held that the regulation did not violate the First Amendment, applying the two-part *Martinez* test to outgoing mail, and the four-part *Turner* test to incoming mail.[17] Regarding outgoing mail, the court held that the regulation satisfied the first element of *Martinez*, because it was "aimed at maintaining the internal security of prisons and deterring violent or otherwise dangerous behavior outside of prison," thereby "clearly further[ing] an important and substantial governmental interest unrelated to the suppression of expression."[18] The court also held that the regulation satisfied the second element—that it be no greater than necessary for protection of the government's interest—because the ban was narrowly tailored to correspondence only with former prisoners: "[a]mple opportunity still exists for prisoners to communicate with the outside."[19]

■ A significant distinction between the regulation at issue in *Nasir* and the contested action in this case is that the

---

12. *Thornburgh v. Abbott*, 490 U.S. at 411, 413, 109 S.Ct. 1874.

13. *Id.* at 412, 109 S.Ct. 1874.

14. *Nasir v. Morgan*, 350 F.3d at 371.

15. *Id.*

16. *Id.*

17. *Id.* at 369.

18. *Id.* at 374.

19. *Id.* at 375. The court also noted that the regulation did "not provide a categorical ban on correspondence with former inmates. Rather, the correspondence may be allowed, 'with written approval of the Superintendent.'" *Id.*

outgoing mail in *Nasir* was completely blocked. Similarly, in *Martinez* the content of the mail was censored. Here, on the other hand, Johnson's mail was only read and photocopied. As the United States Supreme Court has stated, "freedom from censorship is not equivalent to freedom from inspection or perusal."[20] The term "censorship," however, is not consistently defined among courts. For example, the District of Minnesota has held that "indirect censorship" is found in any regulation which chills inmate speech in outgoing correspondence, based upon an inmate's awareness that officials may view the contents of the correspondence.[21] Nonetheless, neither the United States Supreme Court nor Delaware has opined on whether a lesser standard should apply to the mere inspection and copying—rather than censoring or banning—of outgoing mail. Nor did the Third Circuit in *Nasir* address this distinction in deciding to apply *Martinez* to all claims regarding outgoing mail.

The Fifth Circuit has approved, under the lower scrutiny of *Turner*, the actions of prison officials in a scenario nearly identical to what occurred in this case. In *Busby v. Dretke*,[22] the Fifth Circuit addressed convicted inmate Busby's First Amendment claim that the government was not entitled to use against him at trial, letters that he had written to friends and family while in pretrial detention. The policy manual at the prison permitted officials to inspect and read all outgoing non-privileged mail, which they regularly did.[23] Jail administrators testified, however, that inmates "were not given copies of the jail's policy manual ... [but] instead received a brief inmate handbook, which did not explicitly warn inmates that their mail would be read."[24] The handbook did instruct inmates not to seal outgoing envelopes unless the envelopes contained privileged material.[25] Busby's letters contained admissions and descriptions of the underlying killings, which the officials copied and turned over to investigators before sending the originals to the intended recipients.[26]

The court first noted that Busby's phrasing of his First Amendment claim seemed to be a Fourth Amendment claim against unlawful search and seizure "in disguise," which would be barred in the Fifth Circuit action under the rule of *Stone v. Powell*.[27] It then determined, however, that assuming Busby properly alleged a First Amendment violation, "legitimate penological concerns regarding security, order, and rehabilitation permit[ ] prison officials to read all incoming and outgoing correspondence."[28] Importantly, the Fifth Circuit continued:

---

20. *Wolff v. McDonnell*, 418 U.S. 539, 576, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (upholding prison regulation allowing official to inspect incoming legal mail addressed to inmate, in inmate's presence).

21. *Minnesota Civil Liberties Union v. Schoen*, 448 F.Supp. 960, 965–66 (D.Minn.1977) ("Indirect censorship is a 'chilling' of the content of written correspondence; it involves a reluctance on the part of the communicating parties to include certain communication in written correspondence because of the knowledge that such written correspondence may be read by other parties.").

22. *Busby v. Dretke*, 359 F.3d 708 (5th Cir. 2004).

23. *Id.* at 711.

24. *Id.* at 712.

25. *Id.*

26. *Id.* at 711.

27. *Id.* at 720 n. 11; *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

28. *Busby v. Dretke*, 359 F.3d at 721.

The principal harm in reading inmates' outgoing mail, from the point of view of the First Amendment, is presumably that it chills inmates' speech and impairs their ability to convey their true thoughts to outsiders. If Busby were truly unaware that jailers were reading his mail, that might strengthen claims rooted in the Fourth Amendment or *Miranda*, but it would weaken Busby's First Amendment claim.[29]

The court noted that the United States Supreme Court has "never held that *reading* inmate mail violates the First Amendment," thereby distinguishing *Martinez* on this point.[30] The court then endorsed the Fourth Circuit's logic: "as one of our sister circuits has stated, *Martinez's* holding that certain types of mail can be censored *implies* that mail can be read."[31] The court ultimately held that because the government had legitimate interests—concerning rehabilitation, security, and order—for reading Busby's outgoing mail, the First Amendment would not thereafter "bar them from turning letters over to the prosecutors if the jailers happened to find valuable evidence during their routine monitoring."[32] In dictum regarding potential Fourth Amendment violations not properly before the court, the Fifth Circuit also cited *Stroud* as being the only United States Supreme Court case "that actually addresses the evidentiary use of inculpatory jailhouse letters . . . [finding] that there was no violation of the Fourth or Fifth Amendments in such a situation."[33]

*Busby* is a useful case to consider in the context of Johnson's claim for two reasons. First, the facts at issue in *Busby* nearly mirror those at issue here, except for the existence in *Busby* of an inmate policy that mandated all non-privileged mail be left unsealed, thereby potentially putting inmates on notice of inspection. Here, the State has provided the Court with the inmate policy manuals from both detention centers where Johnson was detained pre-trial; both are silent on any right of prison officials to inspect, photocopy, or censor outgoing mail.[34]

Furthermore, there is no evidence that Johnson was actually aware that officials might be reading his mail, and he has testified to that effect. As the court noted in *Busby*, an inmate's lack of awareness that officials are opening his mail might improve a Fourth Amendment claim, but certainly hurts a First Amendment claim, because his speech could not have been chilled if he was unaware that his letters

**29.** *Id.* at 721 n. 13 (citations omitted).

**30.** *Id.* at 722 (emphasis added).

**31.** *Id.* (citing *Altizer v. Deeds*, 191 F.3d 540, 548 (4th Cir.1999) ("Otherwise, a prison official would never know that a letter contained the very type of material that, according to the Supreme Court, could rightfully be censored . . . .")); *see also Feeley v. Sampson*, 570 F.2d 364, 374 (1st Cir.1978) ("The state here, however, asserts not a right to withhold mail but only the right to monitor. *Martinez* clearly recognized such a power in prison officials as a necessary incident of exercising an appropriate censorship function. We do not believe the first amendment rights of those who correspond with detainees, or of detainees themselves, necessarily are any greater.") (citation omitted).

**32.** *Busby v. Dretke*, 359 F.3d at 721.

**33.** *Id.* at 722.

**34.** However, the Inmate Handbook from the first detention center—the Howard R. Young Correctional Institution (HYRCI)—does alert inmates that "Incoming mail is opened, searched for contraband, and delivered to your housing unit." Similarly, the Inmate Housing Rules from the second detention center—the James T. Vaughn Correctional Center—state that "Incoming general and privileged mail is sorted, opened, and inspected for contraband."

containing incriminating information were subject to being read.

Second, the Fifth Circuit held, in *Busby*, that outgoing inmate mail which is only subject to inspection and photocopying, but not censorship, should not be subject to the heightened scrutiny of *Martinez*. That holding is inconsistent with the Third Circuit's application of *Martinez* to all outgoing mail in *Nasir*.

The Third and Fifth Circuits' approaches to outgoing mail, applying *Martinez* and *Turner* respectively, are not the only ones. The Seventh Circuit appears to go one step further than the lower level of scrutiny of *Turner*, finding in *Gaines v. Lane*[35] that all regulations governing inmate mail—incoming or outgoing—are safe from Constitutional challenge. In *Gaines,* the court refused to hear an inmate challenge to Illinois prison regulations that allowed incoming and outgoing non-privileged mail to be censored, reproduced or withheld from delivery "if it presents a threat to prison security or safety." [36]

The Seventh Circuit held that because the regulations "already contain a legislative determination that safety and security are important interests in the proper administration of prison life," inmates cannot challenge the regulations, if the officials took action for suspicion of one of the covered enumerated topics: "threats of physical harm, blackmail, extortion; plans

to escape; coded letters."[37] So long as the officials believe one of these security threats exist, any action taken with regard to the suspicious mail is unchallengeable.[38] The District of Delaware apparently endorses the zero scrutiny approach as well, without elaboration, in the unreported case of *Ali v. Howard:* "Prison inmates have no expectation of privacy regarding their personal mail."[39]

■ After reviewing the varied approaches taken by the Circuit courts in light of somewhat unclear United States Supreme Court precedents, we adopt the approach taken by the Third Circuit—recognizing that the distinctions between incoming and outgoing mail are significant. Accordingly, we will apply the *Martinez* standard to any action taken regarding an inmate's unprivileged outgoing mail as the proper analysis. To survive this scrutiny, we must determine that: (1) the contested actions furthered an important or substantial government interest unrelated to the suppression of expression; and (2) the contested actions were no greater than necessary for the protection of that interest.[40]

Here, the State has explained that it inspected and photocopied Johnson's mail to ensure "that Truitt, Johnson's victim and the only eyewitness to his crimes, was cooperative and available at trial." This governmental interest falls within the category of security concerns that the inmate is engaged in "ongoing criminal activity." [41]

35. *Gaines v. Lane,* 790 F.2d 1299 (7th Cir. 1986).

36. *Id.* at 1304.

37. *Id.* at 1304–05.

38. *Id.* at 1305.

39. *Ali v. Howard,* 2008 WL 4427209, at *5 (D.Del. Sept. 30, 2008) (citing *Hamilton v. Messick,* 2005 WL 736684, at *3 (D.Del. Mar. 31, 2005) (upholding the inspection of outgoing mail); *Smith v. Boyd,* 945 F.2d 1041, 1043 (8th Cir.1991) (upholding the inspection of incoming mail)).

40. *See Nasir v. Morgan,* 350 F.3d at 374 (citing *Procunier v. Martinez,* 416 U.S. at 413, 94 S.Ct. 1800).

41. *See Thornburgh v. Abbott,* 490 U.S. at 412, 109 S.Ct. 1874 (citing *Procunier v. Martinez,* 416 U.S. at 412–13, 94 S.Ct. 1800); *Leonard v. Nix,* 55 F.3d 370, 374 (8th Cir.1995).

The State had received credible information, which Detective Ciritella was able to corroborate, that Johnson was in contact with Truitt, Johnson's attempted murder victim, former girlfriend, and the State's key witness at Johnson's trial for the murder of Hamelin.

Detective Ciritella first attempted to make contact with Truitt, and upon his failure to do so, it is reasonable to assume that he believed inspection of *all* of Johnson's outgoing mail was necessary to ascertain exactly what contact Johnson was having with Truitt, whether direct or indirect. Moreover, the letters that Johnson has put in issue were all mailed to Stewart, Johnson's girlfriend who was living with him at the time of his capture. Stewart was also the individual who alerted the State that she knew Johnson was in contact with Truitt.

The record reflects that the State had a reasonable basis to inspect Johnson's mail to Stewart, specifically, to insure Truitt's attendance and cooperation at trial, since Stewart was directly responsible for the State being alerted to Johnson's contact with Truitt. Stewart herself was convicted of hampering the State's investigation of Johnson. Additionally, after Investigator Ciritella received even more evidence from informants, in January 2008, that Johnson had formed a plot to kill Truitt which involved Stewart's assistance, the government's interest in reading Johnson's letters to Stewart was even greater.

■ The second element of the *Martinez* test, regarding whether the contested actions were no greater than necessary for the protection of the government's interest, is also satisfied here. The prison officials, pursuant to the Attorney General's subpoena, neither blocked, censored, nor confiscated Johnson's outgoing letters. His ability to communicate with outsiders was therefore not impacted by the officials' actions. As the Third Circuit stated in *Nasir,* quoting the United States Supreme Court, "some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty." [42]

Furthermore, of particular significance is the United States Supreme Court's statement in *Martinez* that "[p]erhaps the most obvious example of justifiable *censorship* of prisoner mail would be refusal to send or deliver letters . . . concerning proposed criminal activity, whether within or without the prison." [43] Here, where officials merely inspected and copied Johnson's mail in response to reliable information that he was in fact attempting contact with Truitt for malevolent purposes, the actions taken cannot be said to have been disproportionate to the threat presented. Accordingly, Johnson's First Amendment claim regarding the State's inspection and photocopying of his outgoing letters to Stewart fails.

### Fourth Amendment Claim

■ After *Stroud,* in which the United States Supreme Court permitted the government to use a prisoner's outgoing mail against him at trial, the Court has analyzed prison regulations only under the First Amendment, and not the Fourth Amendment. Yet in this case, Johnson has alleged both First and Fourth Amendment claims regarding the State's use of his letters at trial. For his Fourth Amendment argument, Johnson has relied

---

**42.** *Nasir v. Morgan,* 350 F.3d at 375 (quoting *Procunier v. Martinez,* 416 U.S. at 414, 94 S.Ct. 1800).

**43.** *Procunier v. Martinez,* 416 U.S. at 413, 94 S.Ct. 1800 (emphasis added).

upon *Katz v. United States*,[44] where the Court declared that to find a Constitutional violation, the focus is not on whether authorities invaded some protected area, but upon whether authorities violated an individual's justified expectation of privacy.

As the Fifth Circuit in *Busby* hypothesized in dictum, the existence of an inmate manual announcing that officials will inspect an inmate's outgoing mail is likely the most relevant inquiry (besides whether the inmate otherwise had actual knowledge of inspection) into whether an inmate has an expectation of privacy regarding his outgoing mail.[45] Here, the inmate manual given to Johnson put him on notice that his incoming mail would be open and inspected but did not specifically announce that prison officials might open and inspect his outgoing mail. Johnson claimed in the suppression hearing that he had no actual knowledge that officials were opening and reading his outgoing mail. While these facts, as the court noted in *Busby*, weaken a First Amendment claim, they could strengthen a Fourth Amendment claim. The Fifth Circuit admitted in dictum that "*Busby's* complaint about the letters is probably strongest as a Fourth Amendment argument." Ultimately, however, that court could not address the claim in federal habeas corpus proceedings.[46]

Here, as in *Busby*, Johnson's Fourth Amendment argument may initially appear to be stronger than that under the First Amendment, because he may have had no reason to suspect that officials were inspecting his outgoing mail. However, in *Stroud*, the only United States Supreme Court case addressing the Fourth Amendment, the court permitted the prosecution to introduce evidence from an inmate's outgoing mail. No precedent in Delaware or the Third Circuit indicates a different result. Johnson was on notice that his incoming prison mail was being opened and inspected. We hold that Johnson had no reasonable expectation of privacy regarding his non-privileged outgoing prison mail that he sent to Stewart.[47]

### Attorney General Subpoena Power

■ Neither Johnson, the State, nor the Superior Court has specifically addressed the fact that the seized letters were obtained pursuant to a subpoena issued by the Attorney General of Delaware. Rather, the argument on this point has been focused instead on case law which addresses the general right of prison officials to inspect, censor or confiscate inmate mail. Nonetheless, even when the issue is framed in terms of the Attorney General's subpoena power, the Superior Court's decision to deny Johnson's motion to suppress his letters to Stewart must be upheld.

■ The Attorney General's right to seize evidence pursuant to a subpoena is statutory, arising under two provisions of the Delaware Code.[48] First, under title 29, section 2504(4) of the Delaware Code, the Attorney General has the power, duty and authority "[t]o investigate matters involving the public peace, safety and justice and subpoena witnesses and evidence in connection therewith...."[49] Second, under title 29, section 2508(a), "[t]he Attorney

---

**44.** *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

**45.** *Busby v. Dretke*, 359 F.3d 708, 721 n. 13 (5th Cir.2004).

**46.** *Id.* at 722–23.

**47.** *Stroud v. United States*, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919).

**48.** *See In re McGowen*, 303 A.2d 645, 647 (Del.1973).

**49.** Del.Code Ann. tit. 29, § 2504(4) (2003).

General or any assistant may ... issue process to compel the attendance of persons, witnesses and evidence at the office of the Attorney General or at such other place as designated." [50] In defining the scope of the subpoena power granted to the Attorney General, Delaware case law seems to interpret these statutes as interchangeable. [51]

■ This Court has held that "[t]he purpose of this statutory grant of power [is] to 'confer upon the Attorney General, in the investigation of crime and other matters of public concern, powers similar to those inherent in grand juries', including the grand jury's power to 'compel the appearance of witnesses and the production of documents.' " [52] Importantly, however, although this subpoena power is similar to that of a grand jury, the Attorney General's power to investigate is not terminated by arrest or indictment, and continues throughout the prosecution of an alleged crime. [53]

■ This Court has held that the Attorney General has no independent power to enforce a subpoena once it is issued. [54] Rather, if the individual to whom the subpoena has been directed refuses to abide by its terms, the Attorney General must seek redress in a court, which will then determine independently whether the subpoena is enforceable. [55] Similarly, the party presented with the subpoena may move to quash the subpoena, likewise triggering court review. [56]

In this case, the subpoena was directed to the prison officials where Johnson was housed, rather than to Johnson himself. As Johnson stated in his motion to suppress the letters, "[e]xamination and seizure of the mail has been conducted without the knowledge or approval of Defendant." In other words, the Attorney General's subpoena power went effectively unchecked, because Johnson had no notice and therefore no ability to seek court review of the subpoena before the Attorney General received copies of his mail. [57]

Nonetheless, Johnson's inability to move to quash the subpoena prior to delivery of

50. Del.Code Ann. tit. 29, § 2508(a) (2003).

51. *See, e.g., In re Pennell,* 583 A.2d 971, 972 (Del.Super.1989).

52. *In re McGowen,* 303 A.2d at 647 (quoting *In re Hawkins,* 123 A.2d 113, 115 (Del.1956)).

53. *In re Pennell,* 583 A.2d at 973 (relying on the definition of "investigate" in *Webster's New World Dictionary:* "to search into as to learn the facts; inquire into systematically").

54. *In re Henry C. Eastburn & Son, Inc.,* 147 A.2d 921, 925 (Del.1959).

55. *In re Henry C. Eastburn & Son, Inc.,* 147 A.2d at 925.

56. *Id.*

57. This absence of prior judicial approval led to some confusion at the outset of the suppression hearing:

> Trial Judge: Okay. Yeah, I have that. But that is not a motion authorizing—or an order authorizing interception.
> . . .
> Defense counsel:—I think there was a miscommunication about that. The order was not a request to authorize interception, because it's the State's perception that we didn't need that kind of an order.
> . . .
> Trial Judge: Okay. But those—there's been no judicial finding is the question, I guess, that I was left with the impression there was, there's been no judicial finding that the State had the authority or there was a probable cause basis for them to intercept the mail and review it?
> Defense counsel: That's correct.
> Trial Judge: And that's the purpose of this hearing now?
> Defense counsel: That's correct.

his letters to the State is not dispositive. Johnson did learn of the subpoena's issuance, when the State informed him that it planned to offer the letters into evidence at trial. The Superior Court thereafter independently reviewed the subpoena on Johnson's motion to suppress the letters, and found the subpoena valid.[58]

■ The Fourth Amendment of the United States Constitution requires that a subpoena for the seizure of documents be "reasonable."[59] In order to meet the test of reasonableness, (1) the subpoena must specify the materials to be produced with reasonable particularity, (2) the subpoena must require the production only of materials relevant to the investigation, and (3) the materials must not cover an unreasonable amount of time.[60]

■ First, the subpoena here states: "Please forward copy of all incoming and outgoing mail for inmate Shannon Johnson (SBI 0311727) from 11/15/2006." This command specifies with reasonable particularity what materials must be produced.

■ Second, with respect to relevancy, the State's proffered basis for issuing the subpoena, as argued at the suppression hearing, was the belief that "Mr. Johnson was tampering with the witness testimony. I believe that that's from the statement made from Ms. Stewart at the time of her plea on November 10, 2007, and then confirmed from the telephone conversations

and the visitor logs." The defense argued that this basis for the subpoena only entitled the State, at most, to see letters that Johnson had sent directly to Truitt. The defense further argued that before it learned from two informants, in early January 2008, that Johnson and Stewart allegedly had a plot to kill Truitt, the State had no viable reason to access mail sent from Johnson to Stewart.

The State's purpose of assuring Truitt's attendance and cooperation at trial, however, was sufficiently relevant to the subject matter of the subpoena. Johnson had been ordered to have no contact with Truitt. Contrary to the defense's argument, the information that the State had on December 6, 2007, supported inspection of all of Johnson's mail, and, in particular, his letters to Stewart. Stewart was the witness who alerted the State to Johnson's alleged contact with Truitt. The police could not contact Truitt herself. Stewart was the individual harboring Johnson at the time of his capture.[61] Cumulatively, this information presents a reasonable basis for the State to suspect that Johnson might attempt to contact Truitt indirectly, and that Stewart, in particular, might be involved in or aware of this communication. Moreover, after the information, revealed by the informants in January 2008, about a potential plot between Johnson and Stewart to kill Truitt, the State had

58. This Court has previously heard a motion to quash a subpoena where the party subject to it first voluntarily gave the Attorney General the requested information, and subsequently moved to quash the subpoena. *In re Henry C. Eastburn & Son, Inc.*, 147 A.2d at 923.

59. *In re Blue Hen Country Network*, 314 A.2d 197, 201 (Del.Super.1973) (citing *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946); *Hale v. Henkel*, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906)).

60. *In re Blue Hen Country Network*, 314 A.2d at 201.

61. Additionally, while neither party discussed this fact either at the hearing on the motion to suppress, or in their briefs to this Court, Truitt testified that on November 10, 2006, when she returned to her home for the first time since Johnson had shot at her and killed Hamelin, she crossed paths with only one individual in the minutes before Johnson came around a corner and shot her: Stewart.

even more reason to inspect all of Johnson's mail, and in particular his mail to Stewart.

■ Third, with respect to the reasonableness of the time span covered by the records, the beginning date of November 15, 2006, on the subpoena reflects the date that Johnson was captured and began his pre-trial incarceration. It was reasonable to require the production of all letters that Johnson sent during the entirety of his incarceration pending trial in order to ascertain whether he had contact with Truitt either directly or indirectly. The State's reasonable purpose in making the inspection was to ensure that Truitt would be available to testify at Johnson's trial.

■ We have concluded that the same standards that apply to the proper promulgation of a prison regulation regarding the inspection of inmate mail apply to the Attorney General's subpoena. Accordingly, we have applied the *Martinez* standard to the inspection and copying of Johnson's outgoing prison mail. The record reflects that although Johnson had no prior notice that his outgoing prison mail was being inspected and copied, his letters were not admitted into evidence until there had been an independent judicial determination that the issuance of the Attorney General's subpoena was reasonable. We hold that there was no violation of Johnson's rights under either the First or Fourth Amendments of the United States Constitution.

### Stipulation Waived Severance Issue

■ Johnson contends that the Superior Court erred by not, *sua sponte*, severing the two charges of Possession of a

Deadly Weapon by a Person Prohibited ("PDWBPP") from the remainder of the indictment. However, Johnson never filed a motion to sever the PDWBPP charges. In fact, at trial the defense stipulated that Johnson was a person prohibited pursuant to title 11, section 1448 of the Delaware Code.

■ Superior Court Criminal Rule 8(a) permits multiple offenses to be charged in the same indictment, if the offenses charged "are of the same or similar character or are based on the same act or transaction or ... connected together...."[62] Superior Court Criminal Rule 14 allows for severance "[i]f it appears that a [party] is prejudiced by a joinder of offenses...."[63] Reading these rules *in pari materia*, this Court has held that severance of charges may be appropriate when:

> (1) The jury may cumulate the evidence of the various crimes charged and find guilty when, if considered separately, it would not so find; (2) the jury may use the evidence of one of the crimes to infer a general criminal disposition of the defendant in order to find guilt of the other crime or crimes; and (3) the defendant may be subject to embarrassment or confusion in presenting difference and separate defenses to different charges.[64]

An additional factor to be considered is whether the evidence of the crime sought to be severed would be admissible in a trial of the remaining charges.[65]

■ The decision to grant or deny severance is within the sound discretion of

62. Super. Ct.Crim. R. 8(a).

63. Super. Ct.Crim. R. 14.

64. *Kemske v. State*, 2007 WL 3777, at *3 (Del. Jan. 2, 2007).

65. *Id.* (citing *Wiest v. State*, 542 A.2d 1193, 1195 n. 3 (Del.1988)).

the trial judge.[66] Since no motion to sever was made, however, Johnson's severance claim is waived on appeal unless he can demonstrate plain error.[67] This Court recently reiterated that plain error is predicated upon oversight, as opposed to a tactical decision, of counsel.[68]

The record reflects that defense counsel made a tactical decision to stipulate that Johnson was prohibited from possessing a firearm. Johnson was a person prohibited as result of his 2003 conviction for Rape in the Fourth Degree. By stipulation, Johnson avoided the jury learning about the nature of his prior conviction. Nevertheless, the stipulation did not provide the reason for Johnson's prohibited status. Instead, the stipulation simply stated that the parties agreed Johnson "was prohibited from owning or possession a firearm."

Superior Court Criminal Rule 14 allows a trial judge to order severance even if no request has been made.[69] In Johnson's case, the trial judge did not, *sua sponte,* sever the two PDWBPP charges. In *Bell v. State,* this Court rejected a claim that the trial judge erred by failing *sua sponte* to sever a PDWBPP charge, where defense counsel stipulated to the person prohibited status.[70] We held that the defendant's claim was waived by reason of the stipulation,[71] and reach the same conclusion here.

■ Johnson has the burden to show how he was prejudiced by the charges not being severed.[72] The agreement to stipulate that Johnson was a person prohibited, without disclosing the reason, was a tactical decision by defense counsel to minimize any prejudice that may have been resulted from not severing the charges. Johnson has failed to demonstrate that any error occurred.[73]

### *Letter Redaction In Guilt Phase*

■ During her direct testimony, Truitt testified and read from several letters that Johnson sent to her while he was detained awaiting trial. In those letters, Johnson attempted to convince Truitt not to testify at his murder trial. Several letters were admitted into evidence during the guilt phase. One letter, dated April 25, 2007, was State's Exhibit 43. Truitt was asked to read the following passage from that exhibit as it was displayed on the courtroom monitors:

> I want to know from your mouth, if I was to die how would you—if I was to die how would your life be after that? Think hard about that before you answer. I don't know how you're going to go about my case, but I'm going to put it just like this. If you show up at court, that's on you, meaning that's something that you'll have to live . . . [page turned]
>
> . . . to live with. But if you're not going to, then just—then you just can't show up at court. The state may ride to your house and your Grandmom house to try to find you but, if they can't, then they'll have to let me go. If—has to let me go. *It's just like how that situation*

---

66. *Bates v. State,* 386 A.2d 1139, 1141 (Del. 1978).

67. Supr. Ct. R. 8; *Wainwright v. State,* 504 A.2d 1096, 1100 (Del.1986).

68. *Keyser v. State,* 893 A.2d 956, 961 (Del. 2006); *Bell v. State,* 1993 WL 169143 at *3 (Del. May 3, 1993).

69. Super. Ct.Crim. R. 14.

70. *Bell v. State,* 1993 WL 169143, at *3.

71. *Id.*

72. *Bates v. State,* 386 A.2d at 1141.

73. *Massey v. State,* 953 A.2d 210, 218–19 (Del. 2008). *See also Bell v. State,* 1993 WL 169143, at *3.

*went with my mom and my little sister that time when they told on me and my mom husband got shot.* [Prosecutor interrupts to move witness to different portion of exhibit]. (emphasis added).

No contemporaneous objection was raised. The emphasized sentence was addressed the next day, at a recess:

[Prosecutor # 1]: The second issue is with regard to an exhibit that's already been entered into evidence. Your Honor, as you may recall, Lakeisha Truitt was reading a letter that was sent to her by the defendant. And it was put on the overhead and she read a portion of the letter. And Prosecutor # 2 stopped her at some point during—

The Court: I was wondering when I would hear about this. I've been waiting to see. Have you reviewed those letters? I thought that the defense had an opportunity to review those letters for content, and they would have asked that certain portions be redacted. I was surprised they had not.

[Prosecutor # 2]: They did have the letters, Your Honor.

The Court: I thought so. And I just—I don't know—you're talking about the previous incident where his stepfather was shot or something?

[Prosecutor # 1]: Yes, Your Honor. And I guess it's the State's position at this point that the defense take a position with regards to whether they want a curative instruction or whether—we're amenable to redacting that part. It hasn't gone back to the jury yet. I mean, part of it was read and it was on the overhead, but, I mean, the State wouldn't oppose taking that out at this point.

The Court: Defense?

[Defense Attorney # 1]: Your Honor, I did discuss the issue with Prosecutor # 1 yesterday at the end of the day and then again today. We did have the letters. They were provided to us. And, quite frankly, Your Honor, I'm not sure why an objection wasn't made. Having seen it as soon as it was on the screen, Ms. Truitt was actually I don't want to say a slow reader, but as it wasn't her handwriting, she was reading slowly. And I know I was able to read ahead before—more quickly.

The Court: I did not read it. I don't know what else is in there. Does he confess to another crime in there or anything?

[Defense Attorney # 1]: Well, Your Honor, it indicates that—

The Court: Is he the one that was alleged to have done the shooting?

[Defense Attorney # 1]: It says that his sister and mom told on him and that they didn't show up for court.

The Court: Right.

[Defense Attorney # 1]: And so at any rate, Your Honor, I certainly would have—should have told the State in advance that I wanted that redacted and removed.

The Court: Well, it will be now. And if you wish a curative instruction, draft one up. I don't know that I want to draw any more attention to it when the defense didn't object at the time. I thought—I think at that time there should have been a curative instruction if at any time, but, you know, it's possible the jury thought, Oh, we're not going to see it again and will not recall it. I don't know.

[Defense Attorney # 1]: Well, Your Honor, I'll discuss it with Defense Attorney # 2 and prepare a draft instruction if we choose to present one.

The Court: Very well. Mr. [Defense Attorney # 2]?

[Defense Attorney # 2]: Your Honor, my view is somewhat different than [Defense Attorney # 1].

The Court: Well, why don't you two talk and tell me what you decide together rather than have you disagree on the record. Okay? And you can let me know tomorrow morning.

[Defense Attorney # 2]: No, I thought we—we do not have a disagreement, Your Honor.

The Court: Okay. That's good news.

[Defense Attorney # 2]: We do not wish the item—we do not wish a curative instruction, but we would like to have the—

The Court: Well, why don't you go through the other letters and make sure there's nothing else you want redacted? Okay?

[Defense Attorney # 2]: Okay. No problem.

The State introduced the letter as evidence of Johnson's efforts to influence Truitt's testimony, to demonstrate Johnson's conscious guilt.[74] There was neither an *in limine* request regarding the letter's content nor a contemporaneous defense objection to Truitt's reading of the passage that is now the subject of this claim on appeal. There was also never a request for a mistrial and the trial judge's offer of a curative instruction was specifically rejected by Johnson's defense attorneys.

It was not until the State expressed its concern to the trial judge the following day that this passage in the April 25th letter was addressed. The State was concerned that there could be some misunderstanding by the jury of the partial passage read by Truitt. The State suggested redaction and any remedial measure requested by the defense. Defense counsel told the trial judge that he had discussed the issue with the prosecutor the prior day. Johnson's attorney rejected the offer of a curative instruction and agreed to the redaction suggested by the State. Consequently, a redacted version of the letter was entered into evidence during the guilt phase.

On appeal, for the first time, Johnson argues that the trial judge should have, notwithstanding trial counsel's specific request to the contrary, issued a curative instruction regarding the single line of the April 25th letter. Johnson now contends that the trial judge reversibly erred by failing to instruct the jury "that the information pointing to Johnson's prior shooting of his stepfather should be stricken from their notes." Unlike his position in the Superior Court, Johnson argues to this Court that without a curative instruction from the trial judge to strike that information from their notes, "Johnson's violent, criminal disposition was confirmed to the jury and he lost the benefit of the presumption of innocence."

Since this claim was not raised in the Superior Court, it is reviewed for plain error.[75] Once again, we note that plain error assumes oversight.[76] The record reflects there was no oversight. The issue of the admission of this letter, its content, and the reading of this line was addressed at trial. In fact, it was the State that first raised the concern that the contents might be misinterpreted to Johnson's detriment and therefore suggested redaction.

**74.** *Goldsmith v. State*, 405 A.2d 109, 114 (Del. 1979); *Lovett v. State*, 516 A.2d 455, 468–69 (Del.1986); *Harris v. State*, 1995 WL 354939, at \*2 (Del. June 15, 1995); *Hawkins v. State*, 2002 WL 384436, at \*2 (Del. Mar. 6, 2002).

**75.** *Tucker v. State*, 564 A.2d 1110, 1117–18 (Del.1989).

**76.** *Id.* at 1118.

Johnson had every opportunity at trial to raise the argument he now makes on appeal. Johnson could have asked, as he does now, that the jurors be advised to strike from their notes any reference to the shooting of Johnson's stepfather. Instead, Johnson's attorneys declined the trial judge's offer to give a curative instruction on the matter and agreed to a redaction. Thus, Johnson not only failed to make a request for such an instruction but also rejected the trial judge's offer to draft any curative instruction for the jury. Therefore, Johnson's claim of error has been waived.[77]

### Truitt's Cross–Examination

■■■ Truitt began dating Johnson when she was seventeen years old. When she was nineteen years old, Truitt gave birth to a son, Shannon Johnson, Jr. According to Truitt, the couple's romantic relationship ended in 2003 because of "fights, abuse, and different girls." In August 2006, Truitt began dating Hamelin. On September 24, 2006, Johnson killed Hamelin in Truitt's presence.

During the cross-examination of Truitt, Johnson's attorney began the following line of questioning:

Between 2003 and 2006 when Mr. Hamlin was shot and killed, was Mr. Hamelin the only boyfriend that you ever had?

A. No.

Q. No? Between the time that you and Shannon Johnson broke up and the time that you went out with Mr. Hamelin, approximately how many relationships were you in?

[Prosecutor # 2]: Objection, Your Honor.

The Court: Counsel, approach sidebar.

The trial judge ruled and explained:

The Court: Well, I will allow the question, but I will allow it with the understanding that it does open the door to questions about the conduct of the defendant regarding this victim and her other relationships.

Now, I believe that puts us in a position of perhaps many mini-trials in the course of this trial. But I believe that the question for the purpose offered— and that's the only purpose I think makes it relevant—opens the door to the conduct of this defendant with regard to this victim and her being involved in other relationships.

[Defense Attorney # 1]: Just so there aren't two counsel addressing the Court, your Honor.

The Court: Yes, that's fine.

(Defense counsel conferring.)

[Defense Attorney # 2]: Your Honor, Defense Attorney # 1 just wanted to discuss—I guess, to clarify your ruling, is that, if we ask those questions, the State can get into that line of questioning. Of course, if we don't ask the questions, they can't get into that line of questioning.

The Court: That's correct. I think that the State has clearly indicated they did not pursue that, did not intend to introduce evidence of other acts on the part of this defendant with regard to this victim. And I believe they would become relevant and the state would be entitled to inquire into them.

Mr. Johnson, please rise.

Mr. Johnson, I'm going to take an unusual step here and inquire of you, to

---

**77.** *Czech v. State,* 945 A.2d 1088, 1097–98 (Del.2008); *Smith v. State,* 902 A.2d 1119, 1123 n. 2 (Del.2006).

make sure you understand the choices that are being made as a matter of strategic decision-making in your trial.

Your attorneys have consulted with you and discussed this matter with you, and they've reported to the Court that they've reviewed the Court's order or ruling, which I indicated would likely be my ruling before the recess, that if these questions are asked about Miss Truitt's relationship with other people in the time period preceding the shooting in November—September of 2006 and the time when she says your relationship ended, exclusive relationship ended in 2003, that it will allow the State to introduce testimony from her and any other witness, medical records, any other information that would show whether you had acted in a way that was intimidating or violent toward her as a result of those relationships.

Now, only you know what you did, and Miss Truitt, I suppose. I don't know the answers to those questions, but I raise the issue. Do you understand that, if there is conduct that is of a nature of violence or intimidation or jealousy against this victim as a result of any other relationship between the time she says she stopped seeing you exclusively and the time that she identifies you on September 24, 2006, that that evidence may very well come in?

And I know that you, from the discussions we've had in preparation for this trial, hoped that she would not testify against you. She has appeared and testified. I think that it is reasonable to assume that, if there are other incidents, she may very well testify regarding them. And I say if there are, because I don't know.

Do you understand the ruling of the Court?

The Defendant: Yes.

The Court: Okay. And do you wish to consult with your attorneys further about that decision?

The Defendant: No.

The Court: Okay. And is it your request that your attorneys pursue this line of questioning or not pursue this line of questioning?

The Defendant: To pursue it.

The Court: Okay. And do you understand that the evidence before the Court right now before this jury might be able to be explained by your attorneys as an act of compulsion and a fit of rage that might excuse or in some way lessen the level of the conviction that you might face because it is a single incident, at least as to the first one with Mr. Hamelin? Do you understand that, if they learn about any other instances, if they are out there, that it could change the nature of what the jury might think about you and your conduct?

The Defendant: Yes.

On appeal, Johnson argues that the trial judge erred by ruling that, if Johnson persisted in questioning Truitt about romantic relationships she had between 2003 and 2006 with men other than Hamelin, "it [would] open the door to questions about the conduct of the defendant regarding [Truitt] and her other relationships." According to Johnson, the line of inquiry he was pursuing was both relevant and admissible under Delaware Rule of Evidence 404(a)(1), which provides that "the accused may introduce evidence of a *pertinent trait* of his character to show circumstantially that it is unlikely that he committed the particular offense charged." [78] Johnson argues that Truitt's testimony that none of the other men she had dated between 2003

---

**78.** *Manna v. State*, 945 A.2d 1149, 1155 (Del. 2008).

and 2006 had been harmed by Johnson would have been admissible to establish his "trait of moderation."

Assuming, *arguendo*, that testimony about Johnson's trait of "moderation" was admissible, the trial judge properly ruled that testimony would have opened the door to testimony from Truitt that Johnson was not "moderate." In *Capano v. State*,[79] this Court held that "Rule 404(a)(1) expressly permits the prosecution to use evidence of bad character traits exhibited by the accused to rebut 'evidence of a pertinent trait offered by an accused.'" Therefore, the trial judge properly ruled that, if Johnson persisted in asking Truitt about his conduct toward her other boyfriends, he would open the door to questions about his abuse of Truitt during that same period of time.[80]

### Detective Hall's Testimony

During the penalty phase of Johnson's trial, the State presented evidence of the underlying facts supporting Johnson's Rape in the Fourth Degree conviction. To do so, the State called Q.T.—the victim—and Detective Hall of the Wilmington Police Department. Q.T. testified that she knew Johnson from the neighborhood.

On December 19, 2002, Q.T. was seven or eight months pregnant, and saw Johnson driving on the street. When she got into his car, Johnson locked the car door and would not let her out. Q.T. testified that Johnson drove off and eventually parked the car behind a building in Wilmington, where he "put the car in park and he started like reaching over trying to kiss on me and I was pushing him off ... like pushing him back, like go ahead, like

move back, and he proceeded on doing it and he reached over and he got on top of me and held me down with my arms like this (indicating)." On re-direct, Q.T. continued that, "[Johnson] got on top of me, he put his stuff in me, should I say, and he continued to penetrate without me—when I told him to stop."

Detective Hall, who was the chief investigating officer for the Rape in the Fourth Degree conviction, took the stand immediately following Q.T. Detective Hall testified to Q.T.'s account of the rape at the time:

> She reported that she was in the area of, I believe, 300 block of North Harrison Street, not too far from where she lives and the defendant pulled up, parked, and the two began talking, at which time she was invited inside the car, and they continued to talk about a recent incident that happened not too far from where she lived.

> Shortly thereafter that, after a few moments, she stated that the defendant locked the doors in the vehicle and drove off. She explained that several times she told him to stop, he refused, and ultimately they made their way to the 1300 block of Stockton, which is across Washington Street from the Wilmington Hospital, it's a small alley-type of a street, and once there, she stated that he forced himself upon her by attempting to kiss her and she again told him numerous times to stop, she just wants to go home, and he then began rubbing her vagina area and ultimately overpowered her and pulled her pants down.

79. *Capano v. State*, 781 A.2d 556, 637 (Del. 2001).

80. The record reflects that Truitt sought protection from abuse orders against Johnson between 2003 and 2006. The evidentiary basis on which Truitt had sought protection from abuse orders against Johnson during that period would have been admissible under rule 404(a)(1).

Once that happened, he inserted his penis into her vagina and had vaginal sex with her. After the act was over, she stated that he then drove her back to the area where she lived and he let her out of the car.

Johnson contends that the Superior Court erred by not, *sua sponte*, prohibiting Detective Hall from testifying to Q.T.'s account of that crime. Johnson concedes that he made no objection to the now-challenged testimony. Therefore, Johnson has waived the claim on appeal, unless the error was plain.[81]

Not only did Johnson's counsel fail to object to the hearsay testimony given by Detective Hall, but also defense counsel attempted to use Q.T.'s hearsay statements to his advantage in cross-examination. Counsel for Johnson brought out what, in his view, were inconsistencies in Q.T.'s testimony thereby soliciting additional hearsay by Detective Hall.

The Florida Supreme Court addressed a similar issue in *Bowles v. State*, holding that "[d]uring [capital] penalty proceedings, it is appropriate to introduce details of a prior violent felony conviction in the form of hearsay testimony so long as the defendant has a fair opportunity to rebut." [82] In Johnson's case, the victim testified, was cross-examined, and then re-cross-examined by Johnson's counsel. In addition, Johnson used Detective Hall's hearsay statements from Q.T. to challenge her credibility.

Nevertheless, Johnson argues that "because he has a constitutional right to have the statutory aggravator proven beyond a reasonable doubt, based on evidence admissible under the same evidentiary standards applicable in the guilt phase, and given the fundamental importance of Detective Hall's hearsay testimony to bolster the "force" element of the State's section 4209(3)(1)(i) proof, the error is plain." Assuming, *arguendo*, that an error occurred, we have concluded it was harmless. The record reflects that Johnson's Rape in the Fourth Degree conviction, a prior violent or forcible felony, was proven beyond a reasonable doubt through Q.T.'s own testimony, her medical records, Johnson's plea paperwork and the certified copy of conviction, which were all properly entered into evidence. Moreover, Q.T. was present and cross-examined by Johnson. Accordingly, we hold that Johnson has failed to established plain error.

### Damien's Testimony Properly Excluded

■ After Johnson was convicted of Hamelin's murder in the present case, the State gave notice that Johnson's 2003 rape conviction would be used to show the existence of one statutory aggravator, conviction of a violent or forcible felony.[83] On August 5, 2003, Johnson pled guilty to one count of Rape in the Fourth Degree. Before taking his plea, Johnson completed the Superior Court plea paperwork, including a guilty plea form and the Truth–In–Sentencing form, on which he answered affirmatively that he knowingly, voluntari-

**81.** *See Czech v. State*, 945 A.2d 1088, 1097 (Del.2008); *Martin v. State*, 1998 WL 985994, at *1 (Del. Dec. 18, 1998).

**82.** *Bowles v. State*, 804 So.2d 1173, 1184 (Fla. 2001) (finding no error in the admission of hearsay statement of doctors who treated the victim of a prior violent felony through a police officer in the penalty phase of a capital murder trial, where defense had an opportu-

nity to rebut); *see also Hudson v. State*, 708 So.2d 256, 261 (Fla.1998) (finding no error by the trial court in allowing the testimony of the investigating officer, who described the circumstances of a prior sexual assault for which the defendant was previously convicted).

**83.** Del.Code Ann. tit. 11, § 4209(e)(1)i (2007).

ly and intelligently was entering into the plea.

During the penalty phase, Johnson informed the prosecutrix that he intended to call his brother Damien Johnson ("Damien") to testify about the circumstances of Johnson's 2003 plea. The prosecutrix objected and argued that it would be inappropriate to allow Johnson to challenge the voluntariness of the 2003 plea. Johnson explained that he was not challenging the voluntariness of the plea. Instead, Johnson represented that Damien would testify "[he contacted Johnson] through third parties before [Johnson's fourth degree rape] plea and after Shannon Johnson pled in that 2003 case ... he advised Shannon that if there was a plea that was offered that was a good deal he should take it rather than risk being convicted at trial...." The judge sustained the State's objection and ruled that the testimony was inadmissible hearsay:

> The Court: The purpose of offering this testimony is to establish that the defendant did not accept the plea because he was guilty but rather because he wasn't willing to risk additional jail time.
>
> How do you intend to establish that by other than the defendant's testimony since anything he said to his brother is hearsay?
>
> [Defense Attorney]: Your Honor, what we could establish is that his brother said beforehand that he should do this because my client is still unwilling to testify or at this point, still allocate in any way.
>
> The Court: I can't allow the testimony, it's hearsay. Your objection has been consistent with regard to hearsay. Additionally, because I rule on that, don't necessarily need to reach the issue of whether this jury is to determine whether that conviction is of good validi-

ty, so I do not reach that issue because you, unless or until you present admissible valid testimony regarding the challenge to the entry of the plea, the record will establish the conviction.

> [Defense Attorney]: All right.

In analyzing whether any of the statements attributed to Johnson would have been admissible under any of the hearsay rules, the State correctly asserts that the proffered testimony of Damien encompassed two distinct types of conversations: first, conversations that Damien had with Johnson "through third parties before [Johnson's] plea;" and second, a telephone call between the brothers where Johnson told Damien that he had already accepted a plea. We have determined that the trial judge properly ruled that Damien's testimony with regard to either type of conversation would have constituted inadmissible hearsay.

The first type of conversation at issue is Damien's communication with Johnson through others. In examining the admissibility of Damien's account of the third party conversations with Johnson, we note the obvious fact that Damien did not speak with his brother himself. To the extent that Damien wanted to testify about conversations he had with a third party conveying messages for Johnson or for Damien between Johnson and a third party, such testimony would be hearsay within hearsay.

■ Under Delaware Rule of Evidence 805, "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Accordingly, "[i]f double hearsay is being offered into evidence, each aspect must qualify *independently* as an exception to the hearsay rule." [84] Johnson did not provide the

84. *Flonnory v. State,* 893 A.2d 507, 516 (Del. 2006) (quoting *Demby v. State,* 695 A.2d 1152,

trial judge any authority for why Damien's discussions with third parties about their conversations with Johnson are admissible under any exception to the double hearsay rule. Therefore, the Superior Court correctly concluded that any double testimony by Damien about third party statements attributed to Johnson was inadmissible.

The second type of conversation at issue is the representation that Damien would testify that he had a telephone conversation "with Shannon Johnson in which they discussed it and Shannon, well, they discussed the fact that he had, in fact, taken the plea." Johnson argues that the trial judge abused her discretion in concluding that Damien's testimony was inadmissible hearsay. Johnson contends that his brother's testimony was a statement of Johnson's "then existing state of mind" at the time he took the 2003 plea and was, therefore, admissible under Delaware Rule of Evidence 803(3).

Rule 803(3) "provides an exception to the hearsay rule regardless of whether the declarant is available to testify, for a then existing mental, emotional or physical condition." [85] The requirements for admission of an out-of-court statement under Rule 803(3) are:

1. The statement must be relevant and material;
2. It must be related an existing state of mind when made;
3. It must be made in a natural manner;
4. It must be made under circumstances dispelling suspicion;

5. It must contain no suggestion of sinister motives. [86]

Damien's telephone call with Johnson fails to meet the requirements of Rule 803(3). The statement by Johnson that he had already accepted a guilty plea offer did not reflect Johnson's "then existing mental, emotional or physical condition." The proffer was that Damien told Johnson to accept a plea if a "good deal" was offered to him. The trial judge understood Johnson to be offering the telephone conversation between Johnson and Damien to "establish that the defendant did not accept the plea because he was guilty but rather because he wasn't willing to risk additional jail time." The State submits that assuming, *arguendo*, the trial judge correctly described the purpose behind Johnson's offer of proof, Damien's testimony was inadmissible. We agree. A person's state of mind is reflected in his own words at a particular time, *e.g.*, "I am afraid." [87] In *Capano*, we held that the *reasons* why a person said something cannot be characterized as a "statement" of the person's state of mind. [88] The Superior Court properly exercised its discretion in ruling that Damien's telephone conversation with Johnson did not meet the standards of admissibility under Rule 803(3).

### *Unadjudicated Misconduct Evidence*

Johnson's next argument is that, in the penalty phase, the trial judge committed plain error when she admitted evidence suggesting that Johnson had some involvement in a prior shooting of his step-

1162 (Del.1997)).

**85.** *Forrest v. State,* 721 A.2d 1271, 1275 (Del. 1999).

**86.** *Derrickson v. State,* 321 A.2d 497, 503 (Del. 1974) (applying the common law rule which preceded Rule 803(3)). *Accord Capano v. State,* 781 A.2d 556, 608 n. 127 (Del.2001)

(reaffirming use of the *Derrickson* factors in determining admissibility under Rule 803); *Forrest v. State,* 721 A.2d at 1275–76.

**87.** *Capano v. State,* 781 A.2d at 609.

**88.** *Id.* at 609–10.

father without first weighing the reliability of the evidence and its probative value versus its unfairly prejudicial value. The record reflects that neither of those requests were made by defense counsel at trial. Truitt was recalled during the penalty phase and testified as follows:

Q. Do you remember an incident around the end of August of 2003 with regard to the defendant's stepfather?

A. Yes.

Q. What do you know about that incident from your own knowledge?

A. Shannon's little sister called my cell phone saying that the stepfather and mom got into a fight and she wanted Shannon.

Q. Did you call him?

A. Yes.

Q. And then what did you do?

A. I went over to see that she's okay because she was crying, she was upset, pretty much she got kicked out of the house, so we was in her neighbor's house.

Q. When you are at the neighbor's house do you see the defendant arrive?

A. Yes.

Q. What happens after he gets there?

A. He, I think he ran into the house, I seen him running out.

Q. You saw him running out of the house?

A. Yes, and people were saying that the stepfather was shot, that he shot the stepfather.

[Defense Attorney]: Your Honor, can we approach?

The Court: Sure.

(Sidebar)

[Defense Attorney]: Your Honor, the objection is that it's hearsay, number one, and it deprives Mr. Johnson of the right to confront his accuser if they are going to, the fact that they are going to say he shot somebody.

I was about to argue this yesterday with the Barrow Barnett case. In that particular case, Your Honor, the reason I think it's pertinent is that the intentional murder was reversed because of a violation of the confrontation clause.

Mr. Barrow was convicted of felony murder, so statutory aggravated was already in place, yet the Supreme Court ordered a new penalty hearing because of the confrontation clause violation. The clear implication, even though it doesn't actually say that, is that hearsay is not admissible in either phase of the death penalty proceeding.

The Court: Okay, your objection is hearsay?

[Defense Attorney]: Yes.

The Court: Have you had a chance to read that case, any of you?

[Prosecutrix]: Your Honor, I read several cases. I can't remember if I read that particular case, but I did read several. This is conduct that he was not convicted of. What I'm getting to is the defendant wrote her a letter admitting that conduct.

The Court: Well, let's get there.

[Prosecutrix]: I did ask her to say only what she personally observed and I tried to keep it away from it.

The Court: I understand you asked her to talk from her own personal experience but if she goes astray, and there's an objection, simply lead her if you need to. I'm sure the defense won't object to leading her to keep her away from hearsay and to guide the witness to what she can testify to that is not hearsay, okay.

(Sidebar concluded)

The Court: The objection is sustained.

[By Prosecutrix]:

Q. Lakeisha, I need you to testify about things you actually saw or heard or the defendant told you, okay, things that other people said you can't testify about, okay?

A. All right.

Q. Now, you are there that day and you see him run out?

A. Yes.

Q. Later on did the defendant ever write you any letters about that incident?

A. Yes.

Q. And what did he say about it in the letter, do you remember?

A. He was saying for me not to come to court to testify on him and for me to like hide at his mom's or leave the State because if I wouldn't show, the charges would be dropped against him just like the charges was dropped against him with his stepfather's incident.

Johnson's letter to Truitt was admitted into evidence without objection. Thus, the State's proof of unadjudicated misconduct consisted of evidence of Truitt seeing Johnson run into and out of his stepfather's house, and a reference to charges against Johnson being dropped in a letter written to Truitt by Johnson himself.

Johnson contends that the Superior Court reversibly erred in admitting evidence of unadjudicated misconduct offered by the State in its effort to demonstrate that Johnson attempted to improperly influence and dissuade a witness (Truitt) in this proceeding as he had done with witnesses in a prior prosecution against him. Johnson made no objection at his penalty hearing to this "unadjudicated misconduct" evidence. Consequently, this contention

may now be reviewed on appeal only for plain error.[89]

During the penalty phase, the State recalled Truitt to describe how Johnson attempted to prevent her from testifying against him and that Johnson had also done this to a witness in a previous criminal matter. There was no defense objection to Truitt explaining Johnson's witness tampering behavior, only to her relaying possible hearsay statements in her description of Johnson's involvement in a prior shooting of his stepfather. The State also offered, without objection, the complete April 25th letter in which Johnson both attempted to prevent Truitt from testifying and admitted he had successfully done so previously in connection with charges stemming from an unrelated shooting involving his stepfather.

The record reflects that Johnson's only objection to Truitt's penalty phase testimony was the admission of certain hearsay statements, and that objection was sustained. Johnson now argues on appeal, however, that Truitt's testimony and the admission of his letter at the penalty hearing included improper evidence of "unadjudicated misconduct" about Johnson's involvement in his stepfather's shooting. In addition, on appeal, Johnson contends that the trial judge erred by not *sua sponte* making a judicial determination that the "misconduct Johnson committed" was established to a plain, clear and convincing degree.

■ On appeal, Johnson asks this Court to conclude that the trial judge erred by not making a determination that the State's unadjudicated misconduct evidence was plain, clear and convincing, even though that was not the objection made at

---

**89.** *See Ortiz v. State,* 869 A.2d 285, 301 (Del. 2005) (finding no plain error to require reversal where defense failed to object at trial to rebuttal evidence as improper "unadjudicated crimes" evidence).

**934**

trial. The State argues that a trial judge should not be faulted for not making a specific evidentiary ruling when the subject was never fairly brought to the trial judge's attention. We agree. This Court has emphasized "that counsel must explain the basis for admission or exclusion of evidence in order to preserve the issue for appeal." [90]

■ Eyewitness testimony is normally deemed sufficient to satisfy the plain, clear and convincing standard utilized for admission of other crimes evidence under Rule 404(b).[91] Truitt's testimony as to what Johnson stated to her personally and what she observed satisfies this evidentiary standard.[92] Johnson's own written words describing the unadjudicated misconduct also qualify as plain, clear and convincing evidence.

■ Even if the trial judge should have made a prior determination that the unadjudicated misconduct evidence was plain, clear and convincing before Truitt testified and Johnson's letter was admitted, such an omission was not plain error. The record reflects that the State's evidence of unadjudicated misconduct satisfied the plain, clear, and convincing standard.[93] Therefore, Johnson has not demonstrated plain error.

### *"Cameron's Law" Testimony*

■ While giving his victim impact statement, Hamelin's father, Vandrick Hamelin, Sr., testified how he and his family were trying to cope with Hamelin's death:

> [B]ut since Cameron['s death] we have turned the negative into a positive.
>
> Our family has worked hard down at the Dover Legislation Hall to pass a law in Cameron's name . . .
>
> . . . .
>
> [which] stiffens the penalties for convicted gun felons who continue to commit crimes with guns. So, we are trying to curb the gun violence here in Wilmington, and we hope that no one else would lose their [sic] life to gun violence here in Wilmington with this new law. I mean, I really do hope this law do [sic] make criminals think about committing crimes because they don't know the devastation that it causes families and some people, you know, they hold pictures of their child or little ones and fail to realize they're killing other peoples' children in the process.

Johnson acknowledges he made no objection to the now challenged testimony. Johnson, therefore, has waived the claim on appeal, unless the error was plain.[94] Again, we note that the burden of establishing plain error is on the defendant.[95]

■ Delaware law provides that victim impact evidence is relevant to the sentencing authority.[96] The United States Supreme Court holds that victim impact

**90.** *Weber v. State*, 457 A.2d 674, 680 n. 7 (Del.1983); Supr. Ct. R. 8.

**91.** *Vanderhoff v. State*, 684 A.2d 1232, 1233 (Del.1996); *Kornbluth v. State*, 580 A.2d 556, 559 (Del.1990); *Diaz v. State*, 508 A.2d 861, 865 (Del.1986).

**92.** *Campbell v. State*, 974 A.2d 857, 2009 WL 1525947 (Del. June 2, 2009).

**93.** *Ortiz v. State*, 869 A.2d at 299–301; *State v. Cohen*, 634 A.2d 380, 391 (Del.Super.1992).

**94.** *See Czech v. State*, 945 A.2d 1088, 1097 (Del.2008); *Martin v. State*, 1998 WL 985994, at * (Del. Dec. 18, 1998).

**95.** *Ortiz v. State*, 869 A.2d 285, 299 (Del. 2005).

**96.** Del.Code Ann. tit. 11, § 4331 (2007); *see also In re Petition of State*, 597 A.2d 1, 3 (Del.1991).

statements do not violate the Eighth Amendment of the United States Constitution and serve a legitimate purpose in determining sentencing.[97] In *Payne v. Tennessee*, the Supreme Court specifically recognized the relevance of victim impact evidence that relates to a family's efforts to cope with the loss occasioned by the victim's death.[98]

The State argues that the testimony now challenged by Johnson "was nothing more than three sentences that explained how the Hamelin family was coping with the tragic and unnecessary death of Cameron." Johnson argues that "the jury was being invited (consciously or unconsciously) to join their verdict to Vandrick Hamelin's legislative effort and ... advised, in so many words, that giving Johnson the death penalty would send a message of public support to the Delaware legislature to help redeem Cameron's death with 'Cameron's Law.'" Johnson's assertions are not supported by the record.

■ The only family members who presented victim impact testimony were Vandrick Hamelin, Sr., and Jr., Hamelin's father and brother. The testimony by Hamelin's father was limited and not overly emotional.[99] The jurors were instructed that they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, or public opinion" during their deliberations during the penalty phase. Juries are presumed to follow the trial judge's instructions, and cautionary instructions are presumed to prevent any error.[100] The trial judge, in her sentencing decision, did not mention the family's legislative efforts.[101] Johnson has not carried his burden of showing plain error.[102]

### Statutorily Mandated Review

■ Review of Johnson's death sentence by this Court is statutorily mandated.[103] In the performance of its statutory duty to independently review a sentence of death, this Court conducts a three-part examination. Under title 11, section 4209(g)(2) of the Delaware Code, this Court must review a death sentence to determine whether: (1) the evidence supports, beyond a reasonable doubt, the jury's finding of the particular aggravating circumstances; (2) the sentence was arbitrarily or capriciously imposed or recommended; and (3) the sentence is disproportionate to the penalty imposed in similar cases.[104]

### Statutory Aggravating Circumstance Properly Found

■ In Johnson's case, the State alleged one statutory aggravator: that Shannon Johnson was previously convicted of a felony involving the use of force or violence upon another person.[105] In 2003,

97. *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

98. *Id.* at 825–26, 111 S.Ct. 2597; *see also United States v. McVeigh*, 153 F.3d 1166, 1218–19 (10th Cir.1998).

99. *See, e.g., Starling v. State*, 882 A.2d 747, 758 (Del.2005) (finding no excessive emotional display in victim impact statements).

100. *See Revel v. State*, 956 A.2d 23, 27 (Del. 2008) (citing *Pena v. State*, 856 A.2d 548, 551–52 (Del.2004)).

101. *See Sullivan v. State*, 636 A.2d 931, 940 (Del.1994).

102. *Id.*

103. Del.Code Ann. tit. 11, § 4209(g)(2) (2007); *Starling v. State*, 903 A.2d 758, 762 (Del.2006).

104. *Ortiz v. State*, 869 A.2d 285, 306–07 (Del. 2005); *Swan v. State*, 820 A.2d 342, 359 (Del. 2003).

105. Del.Code Ann. tit. 11, § 4209(e)(1)i (2007).

**936** 

Johnson was convicted of Rape in the Fourth Degree.[106] Johnson now argues that "it is not clear that a Rape 4th conviction is adequate, in itself, to satisfy the force element of § 4209(e)(1)(i)."

 The State has the burden of proving beyond a reasonable doubt that a statutory aggravating circumstance exists.[107] The State submitted the aggravating circumstance that Johnson had been "previously convicted of a felony involving the use of, or threat of, force or violence upon another person." [108] That aggravator is not limited to those offenses that have a statutory element of force or violence,[109] but also encompasses prior felonies that actually involved force or violence. Therefore, if that felony may be proven with or without proof of violence or force, the State must establish the facts underlying the prior felony.

Johnson was charged with Rape in the Second Degree. He later entered a plea of guilty to a charge of Rape in the Fourth Degree.[110] To prove the violent nature of Johnson's prior conviction for the offense of Rape in the Fourth Degree, the State called the victim of that offense, Q.T., during the penalty phase of Johnson's trial. Q.T. related the underlying facts that led to Johnson's rape conviction. The State also called the investigating police officer, Detective Hall. The State also introduced

Q.T.'s medical records, Johnson's plea paperwork and the certified copy of conviction.

The jury was properly instructed that it was required to find beyond a reasonable doubt (1) that Johnson was previously convicted of a felony, Rape in the Fourth Degree, and (2) that that "felony involved the use of, or threat of, force or violence upon another person." The jury made that factual finding.

 The standard of review in assessing an insufficiency of evidence claim is "whether *any* rational trier of fact, viewing the evidence in the light most favorable to the State, could find [a] defendant guilty beyond a reasonable doubt." [111] The jury is the sole fact-finder with responsibility for determining the witnesses' credibility, for resolving conflicts in the testimony, and for drawing any inferences from the proven facts.[112] In Johnson's case, the issue was whether Johnson was guilty of committing a prior felony that involved the use of force.

 The penalty hearing evidence established that Johnson directed "force" towards Q.T. when he sexually assaulted her. In addition to Q.T.'s testimony and that of the detective who investigated this rape, the State offered Q.T.'s medical records

**106.** Del.Code Ann. tit. 11, § 770(a)(3)a (2007).

**107.** *See* Del.Code Ann. tit. 11, § 4209(c)(2) & (3) (2007).

**108.** Del.Code Ann. tit. 11, § 4209(e)(1)i (2007).

**109.** For such *per se* crimes of force or violence, introduction of the judgment documents may be sufficient. *See, e.g., Starling v. State*, 903 A.2d 758, 764 n. 16 (Del.2006).

**110.** Del.Code Ann. tit. 11, § 770(a)(3)a (2007) (sexual penetration that occurs without the victim's consent); Del.Code Ann. tit. 11,

§ 761(i) (2007) (among its statutory definitions " 'without consent' means ... [t]he defendant compelled the victim to submit by any act of coercion ... or by force"); Del.Code Ann. tit. 11, § 4201(c) (2007) (rape fourth degree is designated as a "violent felony").

**111.** *Monroe v. State*, 652 A.2d 560, 563 (Del. 1995) (quoting *Robertson v. State*, 596 A.2d 1345, 1355 (Del.1991)).

**112.** *Chao v. State*, 604 A.2d 1351, 1363 (Del. 1992).

and certified court documents related to Johnson's guilty plea and sentence. According to the testimony of Q.T., Johnson's rape involved restraint and pinning her arms as she struggled to keep him away. Q.T. also testified that Johnson then forcibly penetrated her against her will. Accordingly, we hold that the State proved beyond a reasonable doubt the "force" element of the one statutory aggravating circumstance that it alleged.

### Sentence Was Not Arbitrary or Capricious

 The jury unanimously found by a preponderance of the evidence that the aggravating circumstances outweighed the mitigating factors in this case.[113] In reaching her decision to impose the death sentence, the trial judge described certain details of Cameron Hamelin's murder, summarizing it as follows:

> [It] involves the selfish act of a callous man, who stole a promising future from a nice, young man; who stole a loving son and companion from a family; who denied the community the future contributions of a positive, family-oriented man. Further, he did so in an attempt to continue to direct and control the life of Ms. Truitt, who made a choice, a number of years ago, to enter into a relationship with him, which she had ended. He endangered her life in one of the offenses, and caused her serious injury in the other. He used a firearm on both occasions charged in this indictment. He had a total disregard for anyone but himself in each instance.[114]

In addition to the one statutory aggravating factor, the Superior Court found each of the seven nonstatutory aggravators alleged by the State.[115] In that regard, the sentencing judge considered the following: the particular circumstances and details of Mr. Hamelin's murder and the other crimes in the indictment; Johnson's character and propensities; the impact of the crimes on the Hamelin family and the victim's friends; Johnson's prior criminal history; Johnson's institutional record, demonstrated lack of amenability to lesser sanctions, and failure at previous rehabilitative efforts; acts of domestic violence against his former girlfriend; and Johnson's future dangerousness.[116]

The judge balanced those aggravating factors against the multiple mitigating factors proposed by the defendant. The ten mitigating circumstances focused on Johnson's age, disadvantaged upbringing and certain of his mental and emotional issues.[117] Other mitigating factors included: Johnson's diagnoses for learning disabilities and mental illness; the impact his execution would have on his family; his love for children, especially his young son, Shannon, Jr.; and the nature and circumstances of Johnson's imprisonment for life.[118]

The trial judge set out her rationale for the sentencing decision in a seventeen-page opinion.[119] The evidence supports the trial judge's determination, consistent with the jury's unanimous recommendation, that the aggravating factors out-

113. State v. Johnson, 2008 WL 4140596, at *2 (Del.Super.Sept.5, 2008) (Sentencing Decision).

114. Id. at *8.

115. Id. at *3–5.

116. Id.

117. Id. at *6–7.

118. Id.

119. State v. Johnson, 2008 WL 4140596 (Del.Super.Sept. 5, 2008) (Sentencing Decision).

938

weighed the mitigating factors. A judge's decision is not arbitrary and capricious if the decision is "the product of a deliberate, rational and logical deductive process."[120] The record reflects that the trial judge's well-reasoned decision to impose the death penalty in this case was neither arbitrary nor capricious.

### Death Sentence Proportionate

■ The Court's final inquiry is whether the death sentence imposed in this case is disproportionate to the penalty imposed in similar cases under title 11, section 4209 of the Delaware Code. In the proportionality review mandated by Delaware law, this Court reviews the "universe" of Murder in the First Degree cases which have proceeded to a penalty hearing.[121] Though penalty decisions rendered before the 1991 amendment to section 4209 are pertinent, cases decided under the 1991 amendment are "directly applicable and therefore most persuasive."[122] A definitive comparison of the cases is "almost impossible."[123] Instead, the Court considers the factual background of the relevant cases to deter-

mine the proportionality of the particular sentence.[124]

The record reflects that the sentence imposed on Johnson is not disproportionate to other sentences applied within the universe of applicable cases. Johnson's case is similar to other cases resulting in death sentences where the victim or victims have been current or former lovers or the new paramours of those lovers.[125] Following the killing, Johnson sought to prevent detection and possible prosecution by first shooting Truitt himself and then soliciting another inmate to attempt to do so once he was confined.[126] Johnson intentionally shot and killed Hamelin at close range while Hamelin was seated in a stopped car. Johnson's sentence of death is consistent with other cases involving a deliberate, cold-blooded, execution-style killing of a defenseless victim.[127] Accordingly, we conclude that Johnson's case fits within the pattern of cases where the imposition of the death penalty is appropriate, as reflected in the applicable universe of cases that is attached to this opinion.

**120.** *Manley v. State*, 918 A.2d 321, 329 (Del. 2007) (quoting *Red Dog v. State*, 616 A.2d 298, 310 (Del.1992)).

**121.** *E.g.*, *Ortiz v. State*, 869 A.2d 285, 311 (Del.2005); *Dawson v. State*, 637 A.2d 57, 68 (Del.1994); *Sullivan v. State*, 636 A.2d 931, 950 (Del.1994).

**122.** *Clark v. State*, 672 A.2d 1004, 1010 (Del. 1996).

**123.** *Id.* (quoting *Pennell v. State*, 604 A.2d 1368, 1376 (Del.1992)).

**124.** *E.g.*, *Zebroski v. State*, 715 A.2d 75, 84 (Del.1998); *Clark v. State*, 672 A.2d at 1010.

**125.** *See, e.g.*, *Lawrie v. State*, 643 A.2d 1336 (Del.1994) (arson killing of estranged wife and children); *Weeks v. State*, 653 A.2d 266 (Del.1995) (shooting of estranged wife and companion). *See also Ortiz v. State*, 869 A.2d at 310 n. 111 (collecting similar cases).

**126.** *See Jackson v. State*, 684 A.2d 745, 754 (Del.1996) (holding that death sentence appropriate for one who "planned the death of a witness [to the instant murder] and attempted to have a former jail mate carry out the plans").

**127.** *See Manley v. State*, 918 A.2d 321, 329 n. 20 (Del.2007) (citing *Ortiz v. State*, 869 A.2d at 311); *Ploof v. State*, 856 A.2d 539, 547 (Del.2004); *Pennell v. State*, 604 A.2d at 1377 ("Pennell, like other defendants sentenced to death in Delaware, was found guilty of committing the unprovoked, cold-blooded, execution-style murders of persons who lacked the ability to defend themselves."); *DeShields v. State*, 534 A.2d 630, 649 (Del.1987) ("[T]his case fits into the pattern of the other cases in which the death penalty has been imposed; *i.e.*, an execution-type slaying of a helpless victim in cold blood.").

*Conclusion*

We have carefully reviewed the entire record and we find no error by the Superior Court. Therefore, the judgments of conviction are affirmed. The sentence of death was not imposed or recommended arbitrarily or capriciously and is proportionate to other cases where the death penalty was imposed in the applicable universe of cases. Accordingly, the judgment of the Superior Court, sentencing Shannon Johnson to death, is affirmed.

## APPENDIX A*

Name: Robert Ashley
Criminal ID: 9605003410
County: New Castle
Sentence: Life
Decision on appeal: 2006 WL 797894 (Del. Mar. 27, 2006)

Name: Meri–Ya C. Baker
Criminal ID: 90011925DI
County: New Castle
Sentence: Life
Decision on appeal: 1993 WL 557951 (Del. Dec. 30, 1993)

Name: Jermaine Barnett
Criminal ID: 9506017682
County: New Castle
Sentence: Life
Decision on appeal: 749 A.2d 1230 (Del.2000) (remanding for new sentencing)

Name: Hector S. Barrow
Criminal ID: 9506017661
County: New Castle
Sentence: Life
Decision on appeal: 749 A.2d 1230 (Del.2000) (remanding for new sentencing)

Name: Tyreek D. Brown
Criminal ID: 9705011492
County: New Castle
Sentence: Life imprisonment (4-8)
Decision on appeal: 1999 WL 485174 (Del. Mar. 1, 1999)

Name: Justin L. Burrell
Criminal ID: 9805012046
County: Kent
Sentence: Life
Decision on appeal: 766 A.2d 19 (Del.2000)

Name: Luis G. Cabrera
Criminal ID: 9703012700
County: New Castle
Sentence: Life
Decision on appeal: 747 A.2d 543 (Del.2000)

Name: Luis G. Cabrera
Criminal ID: 9904019326
County: New Castle
Sentence: Death
Decision on appeal: 840 A.2d 1256 (Del.2004)

Name: Thomas J. Capano
Criminal ID: 9711006198
County: New Castle
Sentence: Life (following remand for new penalty hearing)
Decision on appeal: 889 A.2d 968 (Del.2006)

Name: James B. Clark, Jr.
Criminal ID: 9406003237
County: New Castle
Sentence: Death (judge only)
Decision on appeal: 672 A.2d 1004 (Del.1996)

Name: Charles M. Cohen
Criminal ID: 90001577DI
County: New Castle
Sentence: Life
Decision on appeal: No direct appeal taken

Name: Donald Cole
Criminal ID: 0309013358
County: New Castle
Sentence: Life
Decision on appeal: 922 A.2d 364 (Del.2007)

Name: James T. Crowe, Jr.
Criminal ID: 9508008979
County: New Castle
Sentence: Life
Decision on appeal: 1998 WL 736389 (Del. Oct. 8, 1998)

Name: David F. Dawson
Criminal ID: 88K00413DI
County: New Castle (venue changed)
Sentence: Death
Decision on appeal: 637 A.2d 57 (Del.1994)

Name: Byron S. Dickerson
Criminal ID: 90011926DI
County: New Castle
Sentence: Life
Decision on appeal: 1993 WL 541913 (Del. Dec. 21, 1993)

Name: Cornelius E. Ferguson
Criminal ID: 91009926DI
County: New Castle
Sentence: Death (12–0)
Decision on appeal: 642 A.2d 772 (Del.1994)

Name: Donald Flagg
Criminal ID: 9804019233
County: New Castle
Sentence: Life
Decision on appeal: No direct appeal taken

Name: Freddy Flonnory
Criminal ID: 9707012190
County: New Castle
Sentence: Life
Decision on appeal: 893 A.2d 507 (Del.2006)

Name: Sadiki J. Garden
Criminal ID: 9912015068
County: New Castle
Sentence: Life
Decision on appeal: 844 A.2d 311 (Del.2004)

Name: Robert J. Garvey
Criminal ID: 0107010230
County: New Castle
Sentence: Life
Appeal: 873 A.2d 291 (Del.2005)

Name: Robert A. Gattis
Criminal ID: 90004576DI
County: New Castle
Sentence: Death
Decision on appeal: 637 A.2d 808 (Del.1994)

Name: Arthur Govan
Criminal ID: 92010166DI
County: New Castle
Sentence: Life
Decision on appeal: 1995 WL 48359 (Del. Jan. 30, 1995)

Name: Tyrone N. Guy
Criminal ID: 0107017041
County: New Castle
Sentence: Life
Decision on appeal: 913 A.2d 558 (Del.2006)

Name: Jason Anthony Hainey
Criminal ID: 0306015699
County: New Castle
Sentence: Life
Appeal: 878 A.2d 430 (Del.2005)

Name: Akbar Hassan–El
Criminal ID: 010701704
County: New Castle
Sentence: Life
Decision on appeal: 911 A.2d 385 (Del.2006)

Name: Ronald T. Hankins
Criminal ID: 0603026103A
County: New Castle
Sentence: Life
Decision on appeal: 976 A.2d 839 (Del.2009)

Name: Robert W. Jackson, III
Criminal ID: 92003717
County: New Castle
Sentence: Death
Decision on appeal: 684 A.2d 745 (Del.1996)

Name: Larry Johnson
Criminal ID: 0309013375
County: New Castle
Sentence: Life

| | |
|---|---|
| Decision on appeal: | 878 A.2d 422 (Del.2005) |
| | |
| Name: | David Jones |
| Criminal ID: | 9807016504 |
| County: | New Castle |
| Sentence: | Life |
| Decision on appeal: | 798 A.2d 1013 (Del.2002) |
| | |
| Name: | Michael Jones |
| Criminal ID: | 9911016309 |
| County: | New Castle |
| Sentence: | Life |
| Decision on appeal: | 940 A.2d 1 (Del.2007). |
| | |
| Name: | Michael Keyser |
| Criminal ID: | 0310021647 |
| County: | Kent |
| Sentence: | Life |
| Decision on appeal: | 893 A.2d 956 (Del.2006) |
| | |
| Name: | David J. Lawrie |
| Criminal ID: | 92K03617DI |
| County: | Kent |
| Sentence: | Death |
| Decision on appeal: | 643 A.2d 1336 (Del.1994) |
| | |
| Name: | Thomas M. Magner |
| Criminal ID: | 9509007746 |
| County: | New Castle |
| Sentence: | Life |
| Decision on appeal: | 1998 WL 666726 (Del. July 29, 1998) |
| | |
| Name: | Michael R. Manley |
| Criminal ID: | 9511007022 |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 918 A.2d 321 (Del.2007) |
| | |
| Name: | Frank W. Moore, Jr. |
| Criminal ID: | 92S03679DI |
| County: | Sussex |
| Sentence: | Life |
| Decision on appeal: | 1994 WL 202289 (Del. May 9, 1994) |
| | |
| Name: | Adam Norcross |
| Criminal ID: | 0002006278A |
| County: | Kent |
| Sentence: | Death |
| Decision on appeal: | 816 A.2d 757 (Del.2003) |
| | |
| Name: | Juan Ortiz |
| Criminal ID: | 0104013797 |
| County: | Kent |
| Sentence: | Death |
| Decision on appeal: | 869 A.2d 285 (Del.2005) |
| | |
| Name: | Jack F. Outten |
| Criminal ID: | 92000786DI |
| County: | New Castle |

Sentence: Death 
Decision on appeal: 650 A.2d 1291 (Del.1994)

Name: Darrel Page 
Criminal ID: 9911016961 
County: New Castle 
Sentence: Life 
Decision on appeal: 934 A.2d 891 (Del.2007)

Name: James W. Perez 
Criminal ID: 93001659 
County: New Castle 
Sentence: Life 
Decision on appeal: No. 207, 1993, Moore, J. (Del. Feb. 3, 1994)

Name: Gary W. Ploof 
Criminal ID: 0111003002 
County: Kent 
Sentence: Death 
Decision on appeal: 856 A.2d 539 (Del.2004)

Name: James Allen Red Dog 
Criminal ID: 91001754DI 
County: New Castle 
Sentence: Death (judge only) 
Decision on appeal: 616 A.2d 298 (Del.1992)

Name: Luis Reyes 
Criminal ID: 9904019329 
County: New Castle 
Sentence: Death 
Decision on appeal: 819 A.2d 305 (Del.2003)

Name: James W. Riley 
Criminal ID: 0004014504 
County: Kent 
Sentence: Life (following retrial) 
Decision on appeal: 2004 WL 2085525 (Del. Sept. 13, 2004)

Name: Jose Rodriguez 
Criminal ID: 93001668DI 
County: New Castle 
Sentence: Life 
Decision on appeal: 1994 WL 679731 (Del. Nov. 29, 1994)

Name: Richard Roth, Jr. 
Criminal ID: 9901000330 
County: New Castle 
Sentence: Life 
Decision on appeal: 788 A.2d 101 (Del.2001)

Name: Reginald N. Sanders 
Criminal ID: 91010161DI 
County: New Castle (venue changed) 
Sentence: Life (following 1992 resentencing) 
Decision on appeal: 585 A.2d 117 (Del.1990) (remanding for new sentencing)

Name: Nelson W. Shelton 
Criminal ID: 92000788DI

| | |
|---|---|
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 652 A.2d 1 (Del.1995) |

| | |
|---|---|
| Name: | Steven W. Shelton |
| Criminal ID: | 92000787DI |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 650 A.2d 1291 (Del.1994) |

| | |
|---|---|
| Name: | Donald J. Simmons |
| Criminal ID: | 92000305DI |
| County: | New Castle |
| Sentence: | Life |
| Decision on appeal: | No direct appeal taken |

| | |
|---|---|
| Name: | Chauncey Starling |
| Criminal ID: | 0104015882 |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 903 A.2d 758 (Del.2006) |

| | |
|---|---|
| Name: | Brian David Steckel |
| Criminal ID: | 9409002147 |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 711 A.2d 5 (Del.1998) |

| | |
|---|---|
| Name: | David D. Stevenson |
| Criminal ID: | 9511006992 |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 918 A.2d 321 (Del.2007) |

| | |
|---|---|
| Name: | Willie G. Sullivan |
| Criminal ID: | 92K00055 |
| County: | Kent |
| Sentence: | Death |
| Decision on appeal: | 636 A.2d 931 (Del.1994) |

| | |
|---|---|
| Name: | Ralph Swan |
| Criminal ID: | 0002004767A |
| County: | Kent |
| Sentence: | Death |
| Decision on appeal: | 820 A.2d 342 (Del.2003) |

| | |
|---|---|
| Name: | Ambrose L. Sykes |
| Criminal ID: | 04011008300 |
| County: | Kent |
| Sentence: | Death |
| Decision on appeal: | 953 A.2d 261 (Del.2008) |

| | |
|---|---|
| Name: | Antonio L. Taylor |
| Criminal ID: | 9404018838 |
| County: | Kent |
| Sentence: | Life |
| Decision on appeal: | 685 A.2d 349 (Del.1996) |

| | |
|---|---|
| Name: | Milton Taylor |

| | |
|---|---|
| Criminal ID: | 0003016874 |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 822 A.2d 1052 (Del.2003) |

| | |
|---|---|
| Name: | Desmond Torrence |
| Criminal ID: | 0205014445 |
| County: | New Castle |
| Sentence: | Life |
| Decision on appeal: | 2005 WL 2923501 (Del. Nov. 2, 2005) |

| | |
|---|---|
| Name: | Charles H. Trowbridge |
| Criminal ID: | 91K03044DI |
| County: | Kent |
| Sentence: | Life |
| Decision on appeal: | 1996 WL 145788 (Del. Mar. 4, 1996) |

| | |
|---|---|
| Name: | James W. Virdin |
| Criminal ID: | 9809015552 |
| County: | Kent |
| Sentence: | Life |
| Decision on appeal: | 780 A.2d 1024 (Del.2001) |

| | |
|---|---|
| Name: | John E. Watson |
| Criminal ID: | 91008490DI |
| County: | New Castle |
| Sentence: | Life |
| Decision on appeal: | No direct appeal taken |

| | |
|---|---|
| Name: | Dwayne Weeks |
| Criminal ID: | 92010167 |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 653 A.2d 266 (Del.1995) |

| | |
|---|---|
| Name: | Joseph Williams |
| Criminal ID: | 9809018249 |
| County: | New Castle |
| Sentence: | Life |
| Decision on appeal: | 2003 WL 1740469 (Del. Dec. 13, 2002) |

| | |
|---|---|
| Name: | Roy R. Williamson |
| Criminal ID: | 93S02210DI |
| County: | Sussex |
| Sentence: | Life |
| Decision on appeal: | 669 A.2d 95 (Del.1995) |

| | |
|---|---|
| Name: | Jermaine M. Wright |
| Criminal ID: | 91004136 |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 671 A.2d 1353 (Del.1996) |

| | |
|---|---|
| Name: | Craig A. Zebroski |
| Criminal ID: | 9604017809 |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 715 A.2d 75 (Del.1998) |

* The universe of cases prior to 1991 is set forth in appendices to prior opinions by this Court, and those appendices are incorporated herein by reference. *See, e.g., Lawrie v. State,* Del.Supr., 643 A.2d 1336, 1352–56 (1994).