Izzy WHITEHURST, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 193, 2013.

Supreme Court of Delaware.

Submitted: Dec. 11, 2013.

Decided: Dec. 20, 2013.

Christopher S. Koyste, Esquire, Christopher S. Koyste, LLC, Wilmington, Delaware, for appellant.

Karen V. Sullivan, Esquire, Department of Justice, Wilmington, Delaware, for appellee.

Before HOLLAND, BERGER and RIDGELY, Justices.

HOLLAND, Justice:

The defendant-appellant, Izzy Whitehurst ("Whitehurst"), appeals from a jury conviction in the Superior Court of Assault in the First Degree, Robbery in the First Degree, Burglary in the First Degree, Conspiracy in the Second Degree, three counts of Possession of a Firearm During the Commission of a Felony, and three counts of Tampering with a Witness. Whitehurst raises two claims of error in this direct appeal. First, Whitehurst argues that the trial court erred in denying a motion to suppress Whitehurst's prison telephone calls because the State lacked a legal basis to collect them. Second, Whitehurst claims that the admission of those prison telephone calls improperly tainted his trial.

We have concluded that Whitehurst's first argument is without merit. Therefore, we need not address Whitehurst's second contention. The judgments of the Superior Court are affirmed.

### Facts [1]

On the night of October 19, 2011, Erogers Bey ("Bey") pulled into the parking lot of the Budget Inn, located in New Castle County, Delaware. People noticed that he was intoxicated, waving around a lot of cash, and generally attracting attention. When the residents of the Budget Inn saw Bey, they saw him as an easy mark. Jessica "Bella" Harvey, ("Harvey"), who lived in room 109 and worked as a prostitute, noticed Bey, and, along with Tasha "China" Mahaley ("Mahaley"), spoke to him at his car. Both wanted to "date" Bey.

Whitehurst and Mahaley, his girlfriend and mother of his child, approached Whitehurst's friend of thirty years, Tyrone "Uncle Butters" Brown ("Brown"), and asked him if he had a gun because Whitehurst was "going to knock off the joker around the corner." Brown told Whitehurst he did not have a gun and went back to his room. Whitehurst also approached Chris White ("White") and told him that they should "get" or rob Bey. White refused.

Budget Inn's video surveillance, which the police watched with a Budget Inn clerk, showed that Mahaley left room 211, which she shared with Whitehurst and their child, and went downstairs into room 109. An unknown black male then left room 109 and walked towards Memorial Drive and met another person. The un-

---

1. The facts are taken from the parties' briefs.

known Black male who had been in room 109 left the area, but Mahaley and the other individual, a Black male with dreadlocks, walked back towards room 109.

Mahaley then went back to her room, room 211, while the Black male stood outside of room 109. A moment later, Whitehurst, wearing a Black hooded sweatshirt, exited room 211, walked down the steps and met up with the Black male outside of room 109. They lined up in a tactical formation along the wall with Whitehurst behind the other man, who was holding a gun.

Bey was inside room 109 with Harvey. After Harvey's dealer had delivered drugs to her, they heard Whitehurst knock on the door. Harvey opened the door, and Whitehurst pushed his way into the room. A gun barrel prevented Harvey from closing the door. Another resident, Deborah Pyle heard a gunshot from within room 109 a minute or so before seeing Whitehurst and the other man run out of the room.

As soon as Harvey saw the man with a gun, she barricaded herself in the bathroom. She heard a commotion, including Bey "asking for whatever was happening to stop." She also heard Bey say, "Izzy, why are you doing this?" When the noise stopped for a moment, Harvey opened the door a crack and peeked out. She saw Whitehurst on top of Bey and the man with the gun was beating Bey's head with the gun butt. Whitehurst was "running Bey's pockets." Harvey closed the door again. Later, Harvey came out of the bathroom and saw Bey, covered in blood, rolling around the floor mumbling incoherently. She left to tell Mahaley what had happened. Mahaley grabbed her cell phone and left the Budget Inn.

Bey, missing his cellphone and keys, went to the Budget Inn office to call friends to get him. Bey then saw Harvey

running in the parking lot and ran after her. Harvey made her way to the Budget Inn office, and another resident of the Budget Inn prevented Bey from entering the office after Harvey.

The Budget Inn clerk called 911. When the police arrived, they questioned Harvey, who said she did not know who had been chasing her, and that person was gone. Officers looked at the security tape and it showed Harvey in the lobby and White blocking Bey from entering after her. There were no reports of any shots fired, or injuries to anyone.

Officer Michael Rief ("Officer Rief"), a patrol officer assigned to the area of the Budget Inn, returned on routine patrol about an hour after being sent in response to the 911 call. He noticed White in the parking lot and stopped to talk to him about the earlier incident. While the two were talking, Bey came around the corner and said, "I've been robbed." Officer Rief asked Bey, who was unknown to the officer, to wait until he finished his conversation with White. Bey said it did not matter. As he walked away, White mentioned that Bey was the man he was trying to keep out of the lobby.

Bey was eventually brought to the Christiana Hospital emergency room by two women around 1 a.m. Linda Ramsey ("Ramsey"), a forensic nurse, was on duty. Through her training, Ramsey was able to identify that Bey's head had both a gunshot entry wound and an exit wound. Bey also had other wounds to his hand and elbow.

Officer Brian Crisman ("Officer Crisman") was with Bey when he regained consciousness around 5 a.m. Bey mumbled that he had driven to a motel across from the Travel Lodge and been jumped by two black men who took $600 in cash, a phone and the keys to his vehicle. He also told

Officer Crisman that one of the men who jumped him was Whitehurst.

Detective Anthony Tenebruso was the first officer to arrive at the Budget Inn in response to the Christiana Hospital's report. Other officers arrived within the next hour. Detective Lano photographed the crime scene in room 109 and collected a black coat found in a trash can outside of room 109. Detective Lano also collected samples from bloodstains on the carpet and on the tile floor outside the bathroom in room 109. The police were not able to recover any drugs, guns, bullets or shell casings from room 109. Numerous people had been through the room before the police were called and learned it was a crime scene.

After the police obtained search warrants, Detective Lano returned to the Budget Inn and took photographs of rooms 211 and 216. He also collected a black sweatshirt from room 211, which contained bloodstains that belonged to Bey. Skin cells collected from the interior of the cuffs of the same sweatshirt contained Whitehurst's DNA, and he admitted that it was his. Bey's blood was determined to be on the carpet in room 109.

### Witness Tampering Evidence

During the trial, the State introduced testimony of several individuals who testified that Whitehurst had engaged in witness tampering. Brown testified that during a phone call, Whitehurst instructed him to make sure that Jessica Harvey did not go to court. Debbie Pyle testified that both Mahaley and Harvey instructed her to not say anything about the incident and to leave the situation alone.

Gloria Harvey and Jessica Harvey both testified that Mahaley threatened to harm them if Jessica Harvey appeared in court. Gloria Harvey testified that she received a prison phone call from Jessica Harvey because Mahaley had made threats against the Harvey family. Specifically, Jessica Harvey stated that if she showed up for court she would end up in a river, Gloria Harvey would end up with a bullet in the head, and something would happen to Jessica's son. Jessica Harvey testified that the reason she was not fully truthful in her interviews with law enforcement and the State was because of the threats made against her. She also indicated that she was instructed by Mahaley to put the whole incident on Tony Perkins, an individual who had committed suicide after the incident.

The State introduced the testimony of Bey and Kiyona Turner. Bey testified that Ms. Mahaley called him and tried to persuade him to not appear in court. Kiyona Turner testified that Whitehurst instructed her to go to court and to say that Whitehurst was in the room with the baby. In addition, she was instructed to see who was coming to court and to try to find out what Bey looked like.

The State introduced the testimony of Guillermo Santiago. Santiago, an employee of the Delaware Department of Justice, reviewed the recorded prison phone calls of Whitehurst. During the State's direct examination of Santiago, the State played nine of Whitehurst's prison phone calls. Santiago testified that on these prison phone calls, Whitehurst could be heard speaking about Harvey not appearing in court and about Mahaley speaking with Bey. At the end of Santiago's testimony, the State admitted the nine prison phone calls into evidence.

During the defense's case, Whitehurst took the stand to testify. Whitehurst admitted that he had engaged in witness tampering. Whitehurst testified that he felt that the best way to deal with the situation would be to attempt to make sure certain people did not show up to court

and, therefore, he engaged in witness tampering.

In closing, the State argued that the prison phone calls showed that Whitehurst engaged in witness tampering and also showed Whitehurst's consciousness of guilt for the underlying crimes. The State asserted that Whitehurst was worried about the testimony of Jessica Harvey, Bey, Brown, and Kiyona Turner, because these individuals would provide testimony that was different from his own testimony. This worry caused Whitehurst to engage in witness tampering. Accordingly, the State contended that Whitehurst engaged in witness tampering because he knew he was guilty of the underlying offenses, and he was trying to cover his tracks.

The jury found Whitehurst guilty of Assault in the First Degree, Robbery in the First Degree, Burglary in the Second Degree, Conspiracy in the Second Degree, three counts of Possession of a Firearm During the Commission of a Felony, and three counts of Tampering with a Witness.

### Suppression Hearing

At an evidentiary hearing on Whitehurst's motion to suppress, Detective Rizzo testified about the facts that led the State to issue an Attorney General's subpoena for Whitehurst's recorded prison calls. Detective Rizzo explained the facts, as determined by his investigation, of the October 19, 2012 robbery at the Budget Inn. Detective Rizzo explained that the victim, Bey, had identified Whitehurst, but the police had neither determined the identity of the second black man with dreadlocks nor recovered the gun used in the robbery.

Detective Rizzo testified that, during a January 23, 2012 trial preparation meeting, Bey told him that Whitehurst's girlfriend, "China" Mahaley "had reached out to him inquiring if he was going to go to court and basically trying to persuade him

not to go." Detective Rizzo testified that Mahaley and Whitehurst are "boyfriend/girlfriend" and "have a child together." The police believed that Mahaley was "part of a plan to set the victim up" for the robbery.

As a result of his meeting with Bey, Detective Rizzo had concerns that witness tampering was occurring. Although Bey could not provide an exact date and time that Mahaley had called him, Bey said that it was within several days of the January 23rd meeting. The State subpoenaed the recordings of Whitehurst's prison phone calls on January 24, 2012—the day after Detective Rizzo's trial preparation meeting with Bey.

The Superior Court found that "there was an attempt to contact a key witness in this trial ... after the defendant had been indicted on the attempted murder-related offenses." Specifically, the Superior Court found that "the defendant and or agents were tampering with at least one witness, a key witness, the alleged victim [, who] advised he received a phone call from the defendant's girlfriend ... regarding the pending prosecution." The Superior Court made the following rulings: (1) that the State's concern about witness tampering "was an important government interest unrelated to a suppression of expression;" (2) that "the State has a legitimate and reasonable interest in trying to locate the co-conspirator, recover the firearm, and put an end to any suspected witness-tampering so that there could be a fair trial of ... these charges;" and (3) that "the State had legitimate reasons, reasonable reasons to subpoena the defendant's phone calls."

### No Fourth Amendment Violation

 Whitehurst argues that the State violated his Fourth Amendment right to privacy when it subpoenaed his prison phone recordings. Generally, where the

State issues a warrant to conduct a search, the Fourth Amendment requires probable cause before such warrant may be issued.[2] However, probable cause is not required for the State to record prisoners' phone calls or to subpoena the recordings. This is because "prisoners who are notified by prison officials that their communications will be monitored have no expectation of privacy in the mail they send or the telephone calls they make" under the Fourth Amendment.[3] Rather, the seizure of documents or other prison communications by subpoena must be "reasonable" for Fourth Amendment purposes.[4]

■ This Court has held that the reasonableness of a subpoena for prison communications is reviewed under the United States Supreme Court's test outlined in *Procunier v. Martinez*.[5] The *Martinez* standard requires Delaware courts to determine whether "(1) the contested actions furthered an important or substantial government interest . . . , and (2) the contested actions were no greater than necessary for the protection of that interest."[6]

Whitehurst challenges the first prong of the *Martinez* standard, arguing that the State lacked a proper government interest to obtain Whitehurst's phone recordings. The State explains that it had two important government interests to support the subpoena of the prison recordings. First, the State was still searching for the identity of Whitehurst's co-defendant from the burglary and hoped that recorded phone calls might help in that investigation. Second, the State received information from Bey that Mahaley was trying to persuade him not to testify. This raised concerns about witness tampering. This Court has recognized "that there is a legitimate or substantial government interest if the defendant is engaged in witness tampering."[7] "This governmental interest falls within the category of security concerns that the inmate is engaged in 'ongoing criminal activity.'"[8]

The record reflects that the State's proffered reasons to obtain Whitehurst's phone recordings satisfy the first prong of the *Martinez* standard. An on-going investigation in one crime and the investigation of a potential subsequent crime, witness tampering, fall within the important government interest of investigating and preventing criminal activity.[9] Even if the tip

2. *See* U.S. Const. amend. IV. ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").

3. *Johnson v. State*, 53 A.3d 302, 2012 WL 3893524, at *1 (Del.2012) (citing *Rowan v. State*, 45 A.3d 149, 2012 WL 1795829, at *2 (Del.2012); *Johnson v. State*, 983 A.2d 904, 919 (Del.2009)); *see also Rowan*, 2012 WL 1795829, at *2 ("[A] defendant in pretrial detention has no reasonable expectation of privacy in his outgoing, nonprivileged mail, where the defendant is on notice that his incoming mail will be inspected." (citing *Johnson*, 983 A.2d at 919)).

4. *Johnson*, 983 A.2d at 921 (citing *In re Blue Hen Country Network, Inc.*, 314 A.2d 197, 201 (Del.Super.Ct.1973)).

5. *Id.* at 917 (citing *Procunier v. Martinez*, 416 U.S. 396, 423, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)).

6. *Id.* (citing *Nasir v. Morgan*, 350 F.3d 366, 374 (3d Cir.2003)).

7. *Shannon Johnson v. State*, 983 A.2d 904, 917–18 (Del.2009) ("*Johnson I*"); *State v. Tywaan Johnson*, 2011 WL 4908637, at *2 (Del.Super.Ct. Oct. 5, 2011) ("*Johnson II*")

8. *Johnson I*, 983 A.2d at 917 (citations omitted).

9. *Id.*

comes from an uncorroborated source, the State has an interest in investigating criminal activity. Thus, the investigation of Whitehurst's prison activity though the issuance of a subpoena to obtain his phone recordings furthered a substantial government interest. Moreover, there is no indication that the State's recording activities were greater than necessary to further its investigatory efforts, thereby satisfying the second prong of the *Martinez* standard.

Nevertheless, Whitehurst argues that the State did not have a proper basis to suspect that the phone recordings would aid its criminal investigation for the witness tampering charges. Whitehurst contends that the statements from Bey were unreliable and there was no other evidence supporting Bey's claims. Whitehurst appears to suggest that the State should be required to prove that a phone call between Bey and Mahaley actually took place or provide some evidence besides Bey's claims to the police that he had been contacted about his testimony against Whitehurst.

■ This argument is without merit. First, Whitehurst fails to cite to any authority suggesting that the State had an obligation to corroborate Bey's statements. Second, Whitehurst seems to suggest that the State lacked probable cause to subpoena the phone recordings. Subpoenas, unlike search warrants, do not require the State to show probable cause. They only require reasonableness. In *Johnson I,* we held that there must be "a reasonable basis for the State to suspect that [inmate] might attempt to contact [the witness] indirectly." [10] The record supports the Su-

perior Court's application of that standard in this case.

### No First Amendment Violation

■ Whitehurst also contends that the State's monitoring of Whitehurst's prison phone calls raises issues of freedom of expression and violated his First Amendment rights. This Court has held that First Amendment claims related to unprivileged outgoing prison communications must also be reviewed under the Supreme Court's *Martinez* standard.[11] This means that government action does not violate the First Amendment right to free speech when the activity furthers an important or substantial government interest "unrelated to suppression of expression" and the actions were "no greater than necessary" to protect that government interest.[12]

In this case, the State's efforts to record and collect Whitehurst's phone calls do not violate his First Amendment rights. As discussed above, the State's criminal investigation of Whitehurst and his co-defendant is an important government interest. There is no indication that the State's investigation was in any way related to the suppression of expression. Once again we conclude, for First Amendment purposes, the State's recording activities were not greater than necessary to further its investigatory efforts, thereby satisfying *Martinez's* second prong.

### Conclusion

The judgments of the Superior Court are affirmed.

---

10. *Johnson I,* 983 A.2d at 921.

11. *Id.* (citing *Martinez,* 416 U.S. at 423, 94 S.Ct. 1800).

12. *Id.* (citing *Nasir,* 350 F.3d at 374).