IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ANTHONY E. MORRIS, | § | |
| | § | No. 394, 2018 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court of |
| | § | the State of Delaware |
| v. | § | |
| | § | Cr. ID Nos.   1702013025 and |
| STATE OF DELAWARE, | § | 1702012586 |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted:   March 27, 2019
Decided:   May 13, 2019

Before **STRINE**, Chief Justice; **VALIHURA** and **VAUGHN**, Justices.

**O R D E R**

On this 13th day of May 2019, upon consideration of the parties' briefs and the record on appeal, it appears that:

(1)    The appellant, Anthony E. Morris, was found guilty by a Superior Court jury of several crimes that occurred during two related incidents on February 18, 2017—one in the morning and the other later in the day following his release on bail from the first incident.   The same jury also found him guilty of violating the terms of his bond and engaging in witness intimidation while he was in in jail awaiting trial for the February 18 incidents.   On appeal, Morris asserts five claims.   The first pertains to his conviction for the offense of home invasion.   The home-

invasion charge arose from the second February 18 incident. He contends the Superior Court erred by not setting aside his conviction for that offense because the jury was unable to agree on a verdict on a predicate offense of rape in the first degree. Second, he contends the Superior Court erred in failing to hold a proof-positive hearing under 11 *Del. C.* § 2116 in connection with his bail on the first February 18 incident after he was arrested for the second February 18 incident. Third, he contends the Superior Court erred in not suppressing recordings of phone conversations he had while in prison awaiting trial because the subpoena used to obtain the recordings was overly broad and invalid under the United States and Delaware Constitutions. Fourth, he contends the Superior Court erred in admitting these recordings into evidence because the State did not lay a proper foundation for their admission. Finally, he contends the Superior Court erred in denying his motion for a mistrial because delayed disclosure of *Brady*[1] material prejudiced his defense. We reject all of Morris's contentions and affirm.

(2) On the morning of February 18, 2017, Seaford Police Officer Kyle Jones reported to a motel to investigate a domestic incident occurring in the parking lot. When Officer Jones drove to the motel's rear parking lot he observed Morris standing near a vehicle. Once Officer Jones pulled up behind the rear of the vehicle, he observed Morris standing between the open driver's door and the vehicle

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

and Jennifer Middleton in the driver's seat with her legs pointed out. According to Officer Jones, "Morris appeared to be standing in between her legs so that she couldn't get out."[2] As Officer Jones approached, Morris looked at him and then "looked back at Ms. Middleton and struck her with an open hand," hitting her "[i]n her face."[3] Jones immediately pulled Morris off Middleton and placed him under arrest.

(3) Morris was arraigned via a video phone, and the judge imposed unsecured bail with a condition that Morris have no contact with Middleton. At 12:14 p.m., after the no-contact order was explained to Morris and he indicated he understood it, Morris was released from the Seaford Police Department. Officer Jones called Middleton, who had returned to her apartment in Laurel, and informed her of Morris's release and the no-contact order.

(4) The second incident occurred later that same day, shortly after Morris was released. Morris went to Middleton's apartment and began kicking her front door and demanding to be let inside. Middleton did not want him in her apartment, but she also did not want him to kick in her door. Concerned with the noise and afraid someone might report the incident to her landlord, she opened the door to try to "diffuse the situation."[4]

---

[2] App. to Appellee's Answering Br. at B34.
[3] *Id.*
[4] App. to Appellant's Opening Br. at A93.

3

(5)     Once inside her apartment, Morris accused her of getting him in trouble and started punching her.   Middleton "tried to run upstairs so [she] could lock the door," but Morris grabbed her and threw her on the couch.[5]   According to Middleton, he then took off her underwear and pulled down his pants; she repeatedly told him no and asked him to stop; she tried to get up, but he was on top of her holding her down; and he then began having sexual intercourse with her, while she continued telling him to stop.   When he finished, she got up and ran upstairs to the bathroom, locked the door, and took a bath.   Morris then left her apartment.

(6)     Following her bath, Middleton called the police to report the incident. Police officers subsequently arrived at her apartment, and Middleton was taken to the hospital.   At the hospital, a nurse conducted a forensic examination.   As part of the examination, the nurse photographed Middleton's injuries and conducted a vaginal examination, during which she observed "a copious amount of white fluid located in her vaginal wall" that was "consist [sic] with semen."[6]   According to the medical records, Middleton was examined at 3:15 p.m.   Later that day, at approximately 7:45 p.m., after Middleton was released from the hospital, Detective Christopher Story, the chief investigating officer, went to Middleton's apartment to take photographs of the scene.

---

[5] *Id.* at A100.
[6] App. to Appellee's Answering Br. at B65.

4

(7)     For the events that occurred on February 18, Morris was indicted on charges of home invasion, rape in the first degree, strangulation, assault in the second degree, two counts of noncompliance with bond, assault in the third degree, kidnapping in the first degree, misdemeanor theft, and misdemeanor criminal mischief.

(8)     Because at least one charge from each of the February 18 incidents was a violent felony, 11 *Del. C.* § 2116 came into play.    That section applies if a person is arrested for a violent felony and released on bail and, while released, is arrested for a second violent felony.    It provides that the person's bail on the original charge "shall be temporarily revoked by any court" becoming aware that the person is subject to § 2116.[7]    It further provides that the person "shall be brought before the Superior Court."[8]    If, after a hearing, the Superior Court finds that there is "proof positive or presumption great" that the person committed the subsequent offense, the court "shall" then revoke bail on the original offense.[9]    If that occurs, the court must then set cash-only bail on the original offense in an amount at least twice as much as the original bail.[10]

---

[7]  11 *Del. C.* § 2116(c).
[8]  *Id.* § 2116(b).
[9]  *Id.*
[10]  *Id.* § 2116(d).

5

(9)     A proof-positive hearing was scheduled for Morris to be held on March 16, 2017.   On that day Morris appeared with counsel for the hearing.   The State also appeared.   Rather than proceeding directly with the proof-positive hearing, the parties and the court discussed the fact that some of the indicted charges arising out of the first February 18 incident differed from the charges that Morris had been arrested for and that bail had not yet been set on these different charges.   The Superior Court then proceeded to set bail on those charges for which bail needed to be set.   At the conclusion of that process, Morris was subject to bail of $205,000, cash only, for the charges that differed in the indictment and for the charges arising out of the second February 18 incident.   The State then indicated its satisfaction with bail and waived the proof-positive hearing.   Morris had subpoenaed Middleton to appear for the hearing with the intent of calling her as a witness and examining her about the incidents in question.   His counsel insisted that the hearing go forward.   Since the State was content with bail without a § 2116 hearing, however, the Court decided that there was no need for a hearing, and none was held. Morris's bail for the original charges was not increased.

(10)   While at Sussex Correctional Institution (SCI) awaiting trial, Morris made two calls to Middleton, indirectly through a third party, in violation of the no-contact order.   The State issued an Attorney General subpoena to SCI for "all phone recordings for inmate Anthony Morris as well as any calls placed to [two specific

phone numbers] from February 18, 2017 thru present [May 1, 2017]."[11]   SCI produced all of Morris's recorded phone conversations as requested.   Morris, arguing that the Attorney General subpoena was overbroad, moved to suppress the recordings.   The Superior Court denied his motion.

(11)   Following a review of the recordings, Morris was re-indicted to add four additional counts of noncompliance with bond, two counts of act of intimidation, and one count of conspiracy in the second degree for the communications he had with Middleton (and others) while he was in prison awaiting trial.

(12)   At trial, the State sought to introduce the recordings of the phone calls Morris made while in prison that related to Morris's efforts to get Middleton to drop the charges.   Sergeant Brian Hubbs, a facility investigator at SCI who handles the subpoena processing for SCI's inmate telephone system, testified as to the process of logging inmates' calls based on each inmate's State Bureau of Investigation (SBI) number and the process by which an inmate makes a call, explaining that the inmate must first enter his unique SBI number and then verify his voice with the system before placing a call.[12]   He testified that Morris's call log, which was admitted into evidence, was accurate and automatically generated by the computer based on

---

[11] App. to Appellant's Opening Br. at A63.
[12] SCI houses an all-male population.

Morris's SBI number and the requested date range. He further testified that the log "is a que list file of a series of telephone calls that were burnt at the State's request under subpoena"[13] and that he "provide[d] recordings of the calls to the State."[14] Middleton testified as to each recording to identify Morris as the caller. As mentioned, two of the calls were to a third party who then added Middleton to the call. Since she was a party to those two phone calls, she identified two of the recordings as those two calls. Although her voice was not on the other recordings, she was able to identify the speakers on four subsequent recordings as being Morris and his friend Jeremiah Handy because she recognized their voices.

(13) Morris objected to the admission of these recordings. He argued that there was not a proper foundation because the State had not shown that the recordings had not been altered. The Superior Court overruled his objection following a *voir dire* of Middleton. It found that her testimony, which established that Morris was the originator of each call and that the other party to each call (other than herself) was Handy, paired with Sergeant Hubbs's testimony regarding the prison phone system, was sufficient to support a finding that the recordings were what the State claimed them to be and, therefore, admissible under Delaware Rule of Evidence 901(a).

---

[13] App. to Appellant's Opening Br. at A134.
[14] *Id.* at A137.

(14) During his testimony, Detective Story revealed for the first time, on cross-examination, that he had spoken to two individuals who were standing outside, across the courtyard from Middleton's apartment when he went there to take pictures the evening after the second February 18 incident. He asked them whether they "heard or saw anything."[15] He testified that they told him they had not seen or heard anything and that they said "[t]hey didn't know nothing [sic]," although he could not recall if he had specified a time frame when he asked whether they had seen or heard anything.[16] He said that the response of the two individuals was common practice and that "in the apartment complexes in Laurel, nobody talks to the cops. So being in uniform, I asked, and nobody saw anything."[17] He did not make a report of this contact or the names of the individuals.

(15) Following the detective's testimony, Morris moved for a mistrial on the grounds that the statements of the two individuals that they had not seen or heard anything was undisclosed *Brady* material. The Superior Court denied this motion, finding that Morris was able to make effective use of the evidence because it was before the jury and counsel would be able to include it in Morris's closing argument. Then, citing *Deberry v. State*,[18] Morris sought "an instruction that the jury has to

---

[15] *Id.* at A157.
[16] *Id.* at A157, A156-57.
[17] *Id.* at A156.
[18] 457 A.2d 744 (Del. 1983).

accept that neighbors that were there didn't hear anything or didn't see anything."[19]

The Superior Court denied the request.

(16) During his closing argument, Morris highlighted the fact that the two individuals told Detective Story the evening of the second incident that they had not seen or heard anything and that he failed to note this in his report: "They said, We didn't see anything, we didn't hear anything. He characterized that—instead of making a report of it and taking the people's names, he characterized that as they just don't want to cooperate with the police. I won't make a report of it. I won't do anything."[20]

(17) At the conclusion of the trial, the jury failed to reach a verdict on the charge of rape in the first degree, found Morris not guilty of strangulation, and found him guilty of home invasion and the rest of the indicted charges.[21]

(18) Morris's first claim on appeal is that the Superior Court erred in not vacating, or setting aside, his conviction for home invasion. He argues that a finding of guilt on the rape charge was a predicate to a finding of guilt on the home-invasion charge. Since the jury was unable to reach a verdict on the rape charge, he argues, an element of the home-invasion charge was not proved and the verdicts

---

[19] App. to Appellant's Opening Br. at A251.
[20] App. to Appellee's Answering Br. at B89.
[21] The court had (following the close of the State's case) acquitted Morris of kidnapping and reduced the charge of assault in the second degree to assault in the third degree.

10

were inconsistent. For these reasons, he argues, the conviction for home invasion must be vacated. Whether a jury's guilty verdict on the home-invasion charge is inconsistent with its failure to reach a verdict on the rape charge is a question of law subject to *de novo* review.[22]

(19) There are a number of elements to the crime of home invasion, but for purposes of this appeal it is sufficient to state that a home invasion occurs when a person enters or remains unlawfully in a dwelling with the intent to commit a violent felony therein, and while in the dwelling commits or attempts to commit one of six designated felonies.[23] The indictment in Morris's case charged him, in pertinent part, with having entered or remained in Middleton's apartment with the intent to commit a violent felony therein, and when in the dwelling, "the defendant committed or attempted to commit the felony of Rape."[24] Morris asserts that his conviction for home invasion should have been vacated for two reasons. First, he contends that it should have been vacated because the jury was unable to reach a verdict on the predicate charge of rape and the State's evidence at trial was insufficient to support a conviction of attempted rape. Second, and alternatively, he contends that

---

[22] *Van Vilet v. State*, 148 A.3d 257, 2016 WL 4978436, at *3 (Del. Sept. 16, 2016) (Table) (citing *Priest v. State*, 879 A.2d 575, 580 (Del. 2005) (en banc)).
[23] 11 *Del. C.* § 826A(a).
[24] App. to Appellant's Opening Br. at A77.

it should have been vacated because the jury instructions did not provide adequate legal guidance as to the elements of an attempt.

(20) It should first be noted that a conviction for rape or attempted rape is not an element of the offense of home invasion. The element of home invasion in issue is the fact of the commission or attempted commission of rape. Both of Morris's arguments as to this issue fail for the same reason: the rule of jury lenity. "Under the rule of jury lenity, this Court may uphold a conviction that is inconsistent with another jury verdict if there is legally sufficient evidence to justify the conviction."[25] Here, the parties focus exclusively on *attempted* rape, but this misses the point. Middleton testified that Morris *actually* raped her. Her testimony was supported by the pictures of her injuries taken at the hospital and by the nurse's testimony that there was a fluid consistent with semen in her vagina. Viewed in the light most favorable to the State, this evidence establishes that a rational fact finder could have found Morris guilty beyond a reasonable doubt of home invasion.[26] Because this evidence is sufficient to sustain the conviction of home invasion, any inconsistency between the guilty verdict on the charge of home

---

[25] *King v. State*, 126 A.3d 631, 2015 WL 5168249, at *2 (Del. Aug. 26, 2015) (Table) (citing *Tilden v. State*, 513 A.2d 1302, 1306-07 (Del. 1986) (en banc)); *see also United States v. Powell*, 469 U.S. 57, 65-67 (1984).

[26] *See Tilden*, 513 A.2d at 1307; *see also Powell*, 469 U.S. at 67 ("Sufficiency-of-the evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt. This review should be independent of the jury's determination that evidence on another count was insufficient." (citations omitted)).

invasion and the jury's failure to agree on the charge of rape in the first degree is of no avail to Morris, and there is no need to consider the sufficiency of the evidence or the instructions as to attempted rape.

(21) Morris's second argument is that the Superior Court erred in denying his request that the court proceed with the proof-positive bail hearing despite the State waiving its request that his bail for the first February 18 incident be revoked and that bail at least twice the amount originally set be imposed for the original charges. He contends that a proof-positive hearing was mandatory because the statute, 11 *Del. C.* § 2116(b), provides that the defendant "shall be brought before the Superior Court." We review questions of statutory interpretation *de novo.*[27]

(22) The statute provides that "if after release [on the first offense] the defendant is charged by arrest . . . with the commission of a subsequent offense, that defendant shall be brought before the Superior Court."[28] It then provides, "If after a hearing, the Superior Court finds proof positive or presumption great that the defendant has committed [the] subsequent offense during such period of release . . . the Court shall revoke" the defendant's bail on the original offense[29] and impose a cash-only bail at least twice the amount of the bail originally set.[30] Morris was

---

[27] *Pardo v. State*, 160 A.3d 1136, 1142 (Del. 2017).
[28] 11 *Del. C.* § 2116(b).
[29] *Id.*
[30] *Id.* § 2116(d).

13

"brought before the Superior Court"[31] on the day his proof-positive hearing was scheduled. But once the court set bail for the charges alleged to have occurred after the first February 18 incident and for the charges from the first incident that differed in the indictment, the State was content with not seeking to have Morris's bail increased for the unchanged first-incident charges. This eliminated the need to have the proof-positive hearing. Section 2116 does not create a right of discovery for a defendant. The Superior Court did not err in deciding that the hearing was not necessary.

(23) Morris's third argument is that the Superior Court erred in not suppressing the recordings of Morris's prison phone calls. He contends that the subpoena used to obtain the recordings violated his federal and state constitutional rights because it required the production of materials that were not relevant to the investigation and covered an unreasonable period of time. We review alleged constitutional violations *de novo*.[32]

(24) "The Fourth Amendment to the United States Constitution requires that a subpoena for the seizure of documents be reasonable."[33] To be reasonable, a subpoena must: (1) "specify the materials to be produced with reasonable

---

[31] *Id.* § 2116(b).
[32] *Zebroski v. State*, 12 A.3d 1115, 1119 (Del. 2010) (en banc).
[33] *Johnson v. State*, 983 A.2d 904, 921 (Del. 2009) (en banc); *see also Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208-09 (1946).

14

particularity," (2) "require the production only of materials relevant to the investigation," and (3) "not cover an unreasonable amount of time."[34]

(25) Morris takes issue with the second and third requirements. He argues that the subpoena required the production of nonrelevant material because it required production of all of Morris's phone recordings as opposed to just the two calls he arranged with Middleton. He argues that the subpoena covered an unreasonable period of time for essentially the same reason—"[t]he State ha[d] no reasonable basis to believe that all of Mr. Morris's conversations while he was in prison from February 18, 2017 through May 1, 2017 somehow related to this singular alleged contact of [sic] March 8, 2017."[35]

(26) We find that the subpoena was reasonable. First, the subpoena did not require the production of material that was not relevant to the investigation of whether Morris violated the no-contact order or was engaged in witness intimidation. There was evidence that Morris had attempted to intimidate Middleton by calls through a third party to her, and in any event, these calls violated the no-contact order. Because Morris could not contact Middleton directly (her phone number was not on his permitted call list) and, therefore, could contact her only indirectly through a third party, the State had a reasonable basis to suspect that he might have

---

[34] *Johnson*, 983 A.2d at 921.
[35] Appellant's Opening Br. at 26.

tried to contact her at other times through different third parties (and thus different phone numbers) and that he might have tried to convince someone to intimidate Middleton in person, since he could not do so while in prison.[36]   In addition, the time span covered by the subpoena was reasonable.   It was reasonable to require the production of all of the recordings of the phone calls Morris made during the entirety of his pretrial incarceration to ascertain whether he had contact with Middleton either directly or indirectly.[37]   Because the subpoena was reasonable, Morris's constitutional rights were not violated and the Superior Court did not err in denying his motion to suppress.

(27)   Morris's fourth argument is that the Superior Court erred in admitting into evidence the recordings of his prison phone calls because, he contends, there was not a proper foundation.   We review a trial court's evidentiary rulings for abuse of discretion.[38]   "An abuse of discretion occurs when a court has exceeded the bounds of reason in light of the circumstances, or so ignored recognized rules of law or practice so as to produce injustice."[39]

---

[36] *See Johnson*, 983 A.2d at 921-22 (rejecting Johnson's argument that the subpoena was overly broad because it required production of all the letters he wrote while in prison instead of just those he sent directly to the victim he was suspected of attempting to intimidate).

[37] *See id.* at 922 ("It was reasonable to require the production of all letters that Johnson sent during the entirety of his incarceration pending trial in order to ascertain whether he had contact with Truitt [the victim and key witness] either directly or indirectly.").

[38] *McNair v. State*, 990 A.2d 398, 401 (Del. 2010).

[39] *Id.*

(28) Delaware Rule of Evidence 901 governs the authentication of evidence. Under that rule, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."[40] "The burden of authentication is easily met. The State must establish a rational basis from which the jury could conclude that the evidence is connected with the defendant."[41]

(29) The Superior Court acted within its discretion when it determined that the State had made a showing sufficient to support a finding that the recordings were the actual recordings of Morris's phone calls. The court considered Sergeant Hubbs's testimony explaining how the telephone system functions, including its need to verify the inmate's voice before placing a call, how he obtained the records and recordings using Morris's SBI number, and how the call log was connected to the recordings he gave to the State. The court also considered Middleton's testimony identifying Morris's voice at the beginning of each recording during the voice-verification process and identifying the other person's voice as Morris's friend.

(30) Morris primarily argues on appeal (as he did at the trial court) that there was no positive testimony as to whether the recordings had been altered. He contends that Sergeant Hubbs did not testify as to whether the recordings had been

---

[40] D.R.E. 901(a).
[41] *Cabrera v. State*, 840 A.2d 1256, 1264-65 (Del. 2004) (en banc).

altered in any way and that Middleton did not (and could not) know whether the recordings of the beginning portions of the two phone calls involving her had been altered (those portions before she was merged in by Morris's friend) or whether the other four recordings, which did not involve her, had been altered. He fails, however, to point to anything that suggests the recordings were altered. Although the State had the burden of establishing authenticity and admissibility under Rule 901, absent some indication that the recordings had been impermissibly altered,[42] the State was not required to present affirmative evidence that they were unaltered. Authentication of an item offered into evidence does not require the offering party to prove a negative. Accordingly, the Superior Court did not abuse its discretion in finding that the State had produced evidence sufficient to support a finding that these recordings were the actual recordings of Morris's prison phone calls.

(31) Morris's final argument is that the Superior Court erred in denying his motion for a mistrial on the grounds that the State failed to disclose *Brady*[43] evidence that materially prejudiced his defense. This Court reviews claims of *Brady* violations *de novo*.[44] When delayed disclosure of *Brady* information occurs, it must be determined "whether the disclosure of the cumulative exculpatory and

---

[42] There were some redactions from the recordings, but these redactions were done either with Morris's consent or at his direction.

[43] *Brady*, 373 U.S. 83.

[44] *Robinson v. State*, 149 A.3d 518, 2016 WL 5957289, at *2 (Del. Oct. 13, 2016) (Table).

18

impeachment evidence withheld by the State creates a reasonable probability of a different outcome."[45]   As part of this analysis, we consider whether the delayed disclosure precluded effective use of the information at trial.[46]

(32)   Morris contends that he was unable to effectively use the fact that the two individuals told Detective Story the evening of the second incident that they had not seen or heard anything and that "[t]hey didn't know nothing [sic]."[47]   He argues that this delayed disclosure prejudiced his defense because it impeached Middleton's testimony that Morris was banging on her door and yelling loudly.   He argues that he was further prejudiced because Detective Story did not just reiterate what these people said but also characterized their remarks by saying that "in the apartment complexes in Laurel, nobody talks to the cops.   So being in uniform, I asked, and nobody saw anything."[48]   For these reasons, Morris contends that he "was at least entitled to a Deberry instruction that there were two witnesses that were present but did not hear or see Morris at Middleton's apartment, nor hear Morris yelling and screaming or see him kicking her door on February 18, 2017."[49]

(33)   The State concedes that there was a delayed disclosure of *Brady* material but argues that because Morris was able to—and indeed did—make

---

[45] *Wright v. State*, 91 A.3d 972, 993 (Del. 2014).
[46] *White v. State*, 816 A.2d 776, 778 (Del. 2003).
[47] App. to Appellant's Opening Br. at A157.
[48] *Id.* at A156.
[49] Appellant's Opening Br. at 34, 33-34 (citing *Deberry*, 457 A.2d at 751).

effective use of the information, he suffered no prejudice and reversal is inappropriate.

(34) It is not clear that this information actually impeached Middleton's testimony. Detective Story questioned these individuals more than four hours after the incident had occurred, and there was no indication that these individuals were present at the time the incident occurred. Moreover, the *Brady* material did not involve possible testimony that was likely, if given, to create a reasonable probability of a different outcome. For starters, the two witnesses would have had to have been at the apartment complex at the exact time of the relatively brief incident at the door in the early afternoon. At best, if they were, they would have said that they did not hear or observe anything unusual. But, of course, the victim herself said she let Morris in because she did not want him to continue making a racket that would disturb neighbors and lead to a complaint to her landlord. Not only that, there was photographic evidence of the victim's door that depict muddy footprints,[50] which would be an oddment if Morris was not kicking it as the victim said. And there was evidence that Morris obsessively called the victim in violation of a no-contact order during the period before the alleged crimes at her apartment.[51] Finally, the objective evidence of physical force used against the victim—which included

---

[50] *See* App. to Appellant's Opening Br. at A141–42.
[51] *See* App. to Appellee's Answering Br. at B74.

20

photographs of bruises on her arms and face, a swollen eye, and swollen lips[52]—is very strong. For all these reasons, there is not a reasonable probability that the result would have been different had the officer disclosed this information in a timely manner.[53] The Superior Court did not err in denying Morris's motion for a mistrial or in refusing to give a *Deberry* instruction.[54] Accordingly, reversal is not warranted.[55]

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is **AFFIRMED.**

BY THE COURT:

/s/   James T. Vaughn, Jr.
Justice

---

[52] *See id.* at B58–64.

[53] We are reluctant to conclude that the defense was able to make effective use of the fact that the two witnesses say they saw or heard nothing for a simple reason. Detective Story injected his own opinion that the witnesses said that, not because it was true, but because people in that neighborhood will not talk to the police. This opinion testimony was arguably not proper, but in any event, it makes it difficult for us to conclude that the defense could make any effective use of the witnesses' ignorance of any loud incident at the complex that day

[54] *See Robinson*, 2016 WL 5957289, at *3 (finding that the delayed disclosure of a prior inconsistent statement was not a *Brady* violation requiring reversal because the defendant had made effective use of the statement by cross-examining the witness about it and relying on it during his closing argument).

[55] *See White*, 816 A.2d at 778 ("When a defendant is confronted with delayed disclosure of *Brady* material, reversal will be granted only if the defendant was denied the opportunity to use the material effectively." (internal quotation marks omitted)).